*This opinion is subject to revision before final publication in the Pacific Reporter*

**2013 UT 21**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

SUSIE STROHM and DORSEY & WHITNEY, LLP,
*Plaintiffs and Appellees,*

*v.*

CLEARONE COMMUNICATIONS, INC.,
*Defendant and Appellant.*

No. 20110569
Filed April 9, 2013

Third District, Salt Lake
The Honorable Robert K. Hilder
No. 080917500

Attorneys:

Milo Steven Marsden, Cameron M. Hancock, Salt Lake City,
William Michael, Jr., Minneapolis, MN, for appellees

James E. Magleby, Christopher M. Von Maack, Jennifer Fraser
Parrish, Salt Lake City, Brian S. Cousin, Neil A. Capobianco,
New York, NY, for appellant

JUSTICE LEE authored the opinion of the Court in Sections I–V, in
which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

JUSTICE LEE authored the opinion of the Court in Sections VI and
VIII, in which CHIEF JUSTICE DURRANT and
ASSOCIATE CHIEF JUSTICE NEHRING joined.

JUSTICE LEE filed a dissenting opinion in Section VII as to
Section I of JUSTICE PARRISH's opinion, in which
ASSOCIATE CHIEF JUSTICE NEHRING joined.

JUSTICE PARRISH authored the opinion of the Court as to Section I
of her opinion, in which CHIEF JUSTICE DURRANT and
JUSTICE DURHAM joined.

JUSTICE PARRISH filed a dissenting opinion in Section II as to Section VI of JUSTICE LEE's opinion, in which JUSTICE DURHAM joined.

JUSTICE LEE, Opinion of the Court as to Sections I-VI and VIII; dissenting as to Section VII:

¶1    This case concerns a corporation's statutory and contractual duty to indemnify a corporate officer's criminal defense costs. Susie Strohm, the one-time CFO of ClearOne Communications, Inc., was charged with eight federal criminal counts relating to an investigation into certain accounting practices at ClearOne. She was later acquitted of all but one count. Strohm and her counsel, Dorsey, asserted that ClearOne is obligated by statute and contract to indemnify her (and, by extension, Dorsey) for her criminal defense costs and brought suit to collect those costs. The district court agreed with Strohm and Dorsey and ordered ClearOne to indemnify Strohm for her defense costs, subject to certain restrictions. It also found that a contract between the parties entitled Dorsey to charge ClearOne 18 percent interest on the amounts that were billed to ClearOne but not timely paid and to collect the costs it expended in enforcing ClearOne's contractual obligation to indemnify Strohm.

¶2    On appeal, ClearOne challenges the district court's decisions and its ultimate fee award. Strohm and Dorsey cross-appeal the district court's decision to place certain limitations on their indemnification and collection award. A unanimous court affirms the district court's indemnification decisions in large part, its ruling relating to contract termination rights, its reasonableness determination for fees in the criminal case, and its decision to enforce the 18 percent interest rate provision in the Dorsey letter. A majority of the court, however, joining Section I of Justice Parrish's separate opinion for the court, reverses the district court's decision to allow Dorsey to recoup its fees in the collection matter, a determination from which I dissent. We remand for further proceedings.

## I. BACKGROUND

¶3    ClearOne is a manufacturer of video-conferencing equipment based in Salt Lake City. Susie Strohm was its CFO until her resignation in December 2003. This case arises out of civil and

criminal proceedings challenging accounting practices at ClearOne during Strohm's tenure. The Securities and Exchange Commission initiated a civil securities fraud action against ClearOne, Strohm, and Frances M. Flood, ClearOne's then-CEO, to investigate these practices at ClearOne. In early 2003, while that action was pending, the U.S. Attorney for the District of Utah impaneled a grand jury to begin a criminal investigation that paralleled the SEC action. The U.S. Attorney subsequently informed ClearOne that it "had begun an investigation stemming from the complaint in the SEC action."

¶4    In the wake of these actions, ClearOne and Strohm executed an engagement agreement in the form of a letter from Milo Steven Marsden, who was at that time a partner at Bendinger, Crockett, Peterson & Casey, PC, to Strohm and ClearOne. In this letter—signed by ClearOne's CEO Michael Keough—Marsden and Bendinger agreed "to represent [Strohm's] interests in connection with the SEC civil complaint . . . and in connection with further related investigations and litigation." The letter also allowed Marsden and his law firm to collect 18 percent interest on "any amount billed and unpaid" for thirty days and to recover "all reasonable costs expended in connection with collecting amounts due under this Agreement, including reasonable attorneys' fees."

¶5    ClearOne and Strohm entered into two additional agreements in the following year. First, counsel for ClearOne, Strohm, and Flood executed a Joint Defense Privilege and Confidentiality Agreement in February 2003. This agreement allowed the parties to "shar[e] documents, factual material, mental impressions, memoranda, interview reports, litigation strategies, and other information." Later, Clear One and Strohm also executed an Employment Termination Agreement to resolve "disputes regarding Strohm's demand for indemnification." This agreement, like the Joint Defense Agreement, acknowledges that "the SEC action has spawned, and may continue to spawn, multiple related proceedings, including . . . a grand jury investigation being conducted by the United States Department of Justice."

¶6    These agreements governed the parties' relationship until Marsden left Bendinger for Dorsey & Whitney, LLP in 2004. On that occasion, he wrote to ClearOne and Strohm to "update" their engagement letter "to reflect this move." Like the Bendinger letter,

the Dorsey letter confirms that ClearOne and Strohm had engaged Marsden and Dorsey "to represent [Strohm] in connection with the SEC civil complaint . . . and in connection with further related investigations and litigation." But the Dorsey letter differs from the Bendinger letter in several respects. Most importantly for the matter before us, it does not repeat the Bendinger letter provisions allowing 18 percent interest and collection costs and attorney fees. It also lists three by-then-instituted civil matters as being "includ[ed]" in "further related investigations and litigation." But, like the Bendinger letter, the Dorsey letter makes Strohm and ClearOne "jointly and severally responsible for payment of all amounts billed" which are "due on receipt."

¶7    Despite these early internal maneuverings, it wasn't until May of 2007 that the U.S. Attorney informed Marsden that Strohm was the target of a grand jury investigation. Strohm was indicted months later with one count of conspiracy, two counts of making materially false and misleading statements to auditors, and two substantive counts of securities fraud. Two subsequent indictments added a charge of making material misrepresentations to auditors and two perjury counts.

¶8    Work on Strohm's criminal defense began in earnest in May 2007, with ClearOne appearing to recognize an indemnification obligation for her defense costs. Indeed, ClearOne paid Dorsey's bills for the first nine months. By March 2008, however, ClearOne expressly refused to pay any further defense costs and denied that its engagement agreements with Marsden required it to do so.

¶9    In response, Dorsey and Strohm initiated the instant collection action against ClearOne, seeking—among other things—to enforce the engagement agreements and to require ClearOne to indemnify Strohm for her defense costs. Meanwhile, Strohm's criminal trial commenced in early 2009, with Dorsey representing Strohm. Of the eight counts for which she was indicted, Strohm was convicted of only one count—perjury related to testimony given in the SEC action.[1] Following Strohm's near complete ac-

---

[1] Strohm appealed her conviction to the Tenth Circuit Court of Appeals, which upheld it in full. *United States v. Strohm*, 671 F.3d 1173, 1188 (10th Cir. 2011).

quittal, Strohm and Dorsey amended their complaint against ClearOne to remove now-moot claims and to add a claim for mandatory statutory indemnification under Utah Code section 16-10a-903 and -907.

¶10 Both before and after Strohm's criminal trial and limited conviction, the parties engaged in contentious litigation over Strohm's and Dorsey's statutory and contract claims. As to the statutory claims, Strohm and Dorsey filed a motion for summary judgment just after Strohm's conviction, basing their claim for relief on the grounds that Strohm had been acquitted on seven of the eight counts against her. The district court granted the motion, stating that Utah Code sections 16-10a-903 and -907 required ClearOne to indemnify Strohm for "the reasonable expenses incurred by her in connection with the proceeding or claim[s] with respect to which she has been successful." It also ordered ClearOne to pay for Strohm's "reasonable expenses incurred in order to obtain court-ordered indemnification pursuant to" Utah Code sections 16-10a-903 and -907(1).

¶11 Resolution of Strohm's and Dorsey's contract claims was somewhat more complicated. Both parties filed early motions for partial summary judgment relating to Dorsey's claim that its engagement agreement with ClearOne required ClearOne to reimburse it for Strohm's criminal defense costs. But the district court ultimately determined that "facial ambiguity concerning the scope and purpose of the agreements" prevented it from ruling on the motions. It accordingly ordered discovery regarding the intentions of the parties to the engagement letters.

¶12 Discovery ensued over the following months, the most important development being the deposition of ClearOne's 30(b)(6) designee, Keough.[2] In that deposition, Keough testified that when he signed the first engagement letter, he understood that a federal criminal investigation was underway that could result in criminal litigation and claims brought against Strohm. He also testified that when he signed the engagement letters, he understood that Marsden would represent Strohm in both the SEC action and in

---

[2] UTAH R. CIV. P. 30(b)(6) (allowing a corporation to "designate one or more officers, directors, managing agents, or other persons to testify on its behalf" in a deposition).

any related federal criminal investigation. Further, he clarified that he and ClearOne understood the engagement agreements to make ClearOne liable for 18 percent interest and for collection costs necessary to enforce the agreements.

¶13 Strohm and Dorsey thereafter renewed their motion for summary judgment, and ClearOne filed its own cross-motion. The district court granted summary judgment in favor of Strohm and Dorsey based largely on Keough's uncontradicted deposition testimony concerning the intentions of the parties combined with recitals in the Joint Defense Agreement and the Employment Termination Agreement. Specifically, the court held that the engagement agreements "together form an enforceable contract, providing an alternative basis to require [ClearOne] to pay [Strohm's] reasonable legal fees incurred in this action or to reimburse her for fees paid to her counsel and co-plaintiff" and that Strohm and Dorsey were "entitled to judgment for [18 percent] interest and fees incurred in seeking recovery under the letter agreements."

¶14 With ClearOne's obligations under both statute and contract now settled, all parties set about determining the amount of Strohm and Dorsey's award, with Strohm and Dorsey first filing a petition for an Award of Reasonable Attorney Fees and Costs in July 2010 and with ClearOne filing an opposition and cross-motion in response. After hearings on these motions, the district court entered judgments for Dorsey on its contract claim and for Strohm on her statutory indemnification claim. It also ruled that ClearOne could not unilaterally end its obligation to pay for Dorsey's services under the engagement agreements. Based on these judgments, the district court awarded Strohm and Dorsey (1) all hours and expenses billed and paid by ClearOne through March 31, 2008, with no adjustment or reimbursement, (2) reasonable fees and expenses incurred in the criminal case through February 27, 2009, (3) prejudgment interest on criminal case fees and expenses at the rate of 18 percent, and (4) reasonable attorney fees and expenses in the collection case through August 10, 2010.

¶15 ClearOne now appeals, challenging the district court's summary judgment rulings, which we review for correctness. *Bahr v. Imus*, 2011 UT 19, ¶ 15, 250 P.3d 56. ClearOne also challenges the overall reasonableness of the district court's fee award. Due to the district court's "broad discretion in determining what constitutes a reasonable attorney fee[,] . . . we will not reverse

[such a] determination . . . absent an abuse of discretion." *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 33, 52 P.3d 1179. Dorsey cross-appeals, challenging the district court's rulings limiting certain of its awards for attorney fees and interest.

¶16 Under these standards, we first affirm the district court's indemnification rulings in full, except for the decision to limit indemnification for defense costs to those incurred before Strohm's perjury conviction. We likewise affirm the district court's determination that the engagement agreement between the parties does not give ClearOne the right to unilaterally terminate its payment obligation to Dorsey. And though ClearOne challenges the district court's fee award in the criminal case as unreasonable, we disagree and affirm. We next consider and affirm the court's ruling that the parties' engagement agreement contemplated 18 percent interest on unpaid fees and allowed Dorsey to recover fees and costs incurred in enforcing the engagement agreements. We also affirm the district court's decision to enforce the interest rate provision. Finally, though I would enforce the collection fee provision as well, a majority of the court, joining Section I of Justice Parrish's separate opinion, invalidates the collection fee provision on public policy grounds. These holdings require us to remand this matter to the district court for a revised fee award in conformity with this opinion.

## II. INDEMNIFICATION

¶17 On appeal to this court, ClearOne challenges both of the district court's indemnification rulings. For their part, Strohm and Dorsey ask this court to affirm in large part the district court's rulings on indemnification and challenge only certain limitations the district court imposed on indemnification. We agree with Strohm and Dorsey on all counts. We accordingly affirm the district court's indemnification rulings in full save for its limitation of fee reimbursement in the criminal case, which we reverse.

### A. Statutory Indemnification

¶18 After Strohm successfully challenged seven of the eight counts for which she was indicted, she amended her complaint against ClearOne to include a claim for mandatory statutory indemnification under Utah Code sections 16-10a-903 and -907. The district court then granted Strohm's motion for partial summary

judgment on that claim, a decision ClearOne now challenges on three grounds.

1

¶19 ClearOne's first statutory argument is based on section 902, which allows a corporation to indemnify its director if "his conduct was in good faith; . . . he reasonably believed that his conduct was in, or not opposed to, the corporation's best interests; and . . . in the case of any criminal proceeding, he had no reasonable cause to believe his conduct was unlawful." UTAH CODE § 16-10a-902(1). According to ClearOne, this statute establishes a "standard of conduct" and limits the indemnification a corporation can provide to its officers. This argument falters on the grounds that it misconstrues section 902 and ignores other sections of the code that expressly apply to officer indemnification.

¶20 By its own terms, section 902 applies only to the directors of a corporation. *Id.* ("[A] corporation may indemnify an individual made a party to a proceeding because he is or was a *director* . . . ." (emphasis added)). This section's title ("Authority to indemnify directors") confirms that. *Id.* We can find nothing in section 902 that suggests that it extends beyond directors to encompass officers.[3] *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465 (stating that statutory interpretation often requires examination of a statute's structural context).

¶21 An examination of the rest of title 16 supports this result. We interpret individual sections of the code "in harmony with other provisions in the same statute and with other statutes under the same and related chapters." *Sill v. Hart*, 2007 UT 45, ¶ 7, 162 P.3d 1099 (internal quotation marks omitted). We must look to these other sections to decide if all of the standards for director indemnification apply equally to officer indemnification, as ClearOne seems to suggest. Because the code contains provisions that specifically govern officer indemnification, we cannot presume that all the provisions governing director indemnification

---

[3] The code is riddled with instances where a director is treated differently than an officer. *See, e.g.,* UTAH CODE § 16-10a-841 (allowing corporations to limit the liability of its directors on a broad scale, but suggesting that officer liability can only be limited when a corporation is a certain type of depository institution).

apply to officers as well. *See* UTAH CODE § 16-10a-907 (entitled "Indemnification of officers, employees, fiduciaries, and agents"). This is particularly true given that the code makes specific director indemnification provisions—and not others—applicable to officers. *See id.* § 16-10a-907(1) (providing that officers are entitled to mandatory and court-ordered indemnification to the same extent as a director under Utah Code sections 16-10a-903 and -905). Because no statute makes officer indemnification subject to, dependent on, or coextensive with permissive director indemnification under section 902, we decline ClearOne's request that we apply that section to deny Strohm's statutory indemnification claim.

¶22 The district court ordered ClearOne to indemnify Strohm under sections 16-10a-903 and -907—not under section 902. Under section 907, an officer is entitled to mandatory indemnification only to the extent that a director is entitled to indemnification under 903. *Id.* And section 903 requires a corporation to indemnify a director who successfully defended himself in a proceeding where he was a party to the action because he was/is a director of the corporation. *See id.* § 16-10a-903. Thus, an officer is entitled to mandatory indemnification when he successfully defends himself in a proceeding where he was a party because he was/is an officer of a corporation. *See id* § 16-10a-907(1).

¶23 Yet ClearOne inexplicably presents section 902 to us as controlling in this case. It does so by inserting a bracketed "or officer" immediately after the word "director" in its quote of the language of the statute. This is not an accurate portrayal of section 902. ClearOne is free to argue that when the statute says "director," it means "director or officer." But that argument must be based on the language of the statute as written, not on a misleading alteration to its quoted terms. ClearOne's bracketed "or officer" comes perilously close to the latter. Counsel do damage to the credibility of their arguments when they are made to rest on confusing distortions of the controlling legal text. ClearOne's position fails on its merits. But it is not at all helped by counsel's bracket-bungled "quote" of the statutory text.

¶24 As neither section 907 nor section 903 make mention of section 902's standard of conduct, we reject ClearOne's argument that only officers complying with that standard are entitled to indemnification. We will not import into one statutory section language from another when nothing in the statute or statutory

scheme requires it. Because Strohm successfully defended seven of the eight charges brought against her in her capacity as an officer of ClearOne, she is entitled to indemnification from ClearOne under Utah Code sections 16-10a-903 and -907 for the reasonable expenses she incurred in doing so. We accordingly affirm the district court's ruling on statutory indemnification.

2

¶25 ClearOne next argues that it avoided any statutory duty of indemnification by exercising a statutory option to limit its duty to indemnify officers. Specifically, ClearOne suggests that it "adopted bylaws limiting indemnification to officers and directors who have satisfied the requisite standard of conduct"—the same standard of conduct described in Utah Code section 16-10a-902. This argument likewise fails. Once again, ClearOne ignores the unambiguous language of the statute and advocates a position that is unsupported by law.

¶26 It is true that Utah Code section 16-10a-907 allows a corporation to limit its duty to indemnify its officers. But, by the terms of that statute, a corporation must place such limitation in its *articles of incorporation*. *Id.* Nowhere does section 907 allow a corporation to place limitations on indemnification in its *bylaws*. Because "articles of incorporation" is unambiguous and on its face does not encompass bylaws, ClearOne's attempt to limit indemnification in its bylaws is of no consequence under the controlling statute in this case. We refuse to dismiss the statutory terminology as insignificant. Bylaws are not articles of incorporation, and a statute contemplating the latter is not satisfied by the former.

¶27 Once again, the rest of the code reinforces this conclusion. In many instances, the code illustrates that "bylaws" and "articles of incorporation" are not interchangeable. As just one example, the Utah Revised Business Corporation Act delineates how articles of incorporation and bylaws may be amended. The process for amending articles of incorporation is much more restrictive than the process imposed for bylaws. *See id.* §§ 16-10a-1001 to -08, 10a-1020 to -23. To amend articles of incorporation, for instance, the board of directors must propose an amendment, which must then be voted upon by the shareholders. *Id.* § 16-10a-1003. Yet, either the board of directors or the shareholders can amend a corporation's bylaws at any time. *Id.* § 16-10a-1020. Thus, articles of in-

corporation and bylaws are hardly interchangeable. The differences in statutory procedures for their amendment highlight the perils of equating them.

¶28 In any event, the bylaws cited by ClearOne do not support the indemnification standard it advances. The only indemnification limit in the bylaws that imposes a standard of conduct—Section 5.1—applies only to directors. Though ClearOne cites this section as "expressly prohibit[ing] indemnification of a director *or officer* unless" the standard of conduct is satisfied, it clearly does no such thing with respect to officers. That is not to say that ClearOne's bylaws do not limit officer indemnification in any way. They do. Section 5.3 limits officer indemnification, but does so without imposing the standard of conduct listed in 5.1. Instead, it allows ClearOne to indemnify officers "to any extent consistent with public policy." As discussed below, we can identify no public policy ground that would prevent Strohm from meriting indemnification in this instance. *Infra* ¶¶ 29–32. Therefore, nothing in ClearOne's bylaws—or articles of incorporation—prevents it from indemnifying Strohm.

3

¶29 ClearOne's final challenge to the district court's statutory indemnification ruling is grounded in public policy. Section 902, it argues, "establishes a Utah public policy prohibiting the use of corporate funds unless the corporate director or officer has satisfied the requisite standard of conduct." We disagree.

¶30 While declarations of public policy may be found in statutes, not all statutory provisions constitute overarching statements of public policy. *See Peterson v. Browning*, 832 P.2d 1280, 1282 (Utah 1992). And nothing in this statute suggests to us that section 902 is such a statement. Instead, we read section 902 as part of a larger indemnification scheme that is itself a comprehensive statement of public policy.

¶31 The code provides for three types of indemnification: permissive, court-ordered, and mandatory. *See* UTAH CODE §§ 16-10a-902, -905, -907. Permissive indemnification is subject to the standard of conduct described in section 902. Mandatory indemnification, on the other hand, does not depend on any standard of conduct. *See id.* §§ 16-10a-905, -907. Thus, corporations may be *required* to indemnify an officer even when that officer has acted in a

manner that is contrary to section 902's standard of conduct. Given that indemnification is statutorily required in some circumstances despite noncompliance with the 902 standard of conduct, it cannot be against public policy to allow corporations to indemnify officers that do not meet such a standard of conduct. Rather, Utah's public policy concerning indemnification for corporate officers and directors encompasses a range or scale of duties of indemnification—one that, at least sometimes, does not require compliance with a standard of conduct.

¶32 The text of the statutory indemnification scheme is the governing public policy in this area. *See VCS, Inc. v. La Salle Dev., LLC*, 2012 UT 89, ¶ 23, 293 P.3d 290 ("[The purported purpose of a statute] cannot be used to . . . override the meaning of a statute that is otherwise plain."). By applying the statute as written, we remain faithful to the public policy embraced by the legislature. And the statute, on its face, requires ClearOne to indemnify Strohm for her successful criminal defense. We accordingly affirm the district court's statutory indemnification ruling.

## B. Contractual Indemnification

¶33   ClearOne next argues that the district court erred when it ruled that the engagement agreements were an "alternative basis" for criminal defense indemnification.[4] We conclude that the engagement letters unambiguously required ClearOne to indemnify Strohm for her criminal defense, and affirm the district court's ruling on this alternative ground.

¶34 Whether the engagement letters required ClearOne to indemnify Strohm for her criminal defense is a matter of contract interpretation. "When interpreting a contract, a court first looks to the contract's four corners to determine the parties' intentions, which are controlling." *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 16, 52 P.3d 1179. "[T]he parties' intentions are deter-

---

[4] Though the district court referred to the engagement agreements as being an "alternative basis" for requiring indemnification, the agreements are more aptly described as superior sources of indemnification. As explained below, the engagement agreements provide a broader indemnification right than does the statute and so cannot be thought of as merely backing up the statutory indemnification duty.

mined from the plain meaning of the contractual language . . . .” *Glenn v. Reese*, 2009 UT 80, ¶ 10, 225 P.3d 185 (internal quotation marks omitted); *Pugh v. Stockdale & Co.*, 570 P.2d 1027, 1029 (Utah 1977) (“The beginning point of interpretation of a contract is . . . the ordinary and usual meaning of the words.”). We consider extrinsic evidence of party intent only when the contractual language is ambiguous. *Glenn*, 2009 UT 80, ¶ 10. “A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies.” *Id.* (internal quotation marks omitted). “Whether a contract is ambiguous is a question of law, which we . . . review for correctness.” *Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 16, 215 P.3d 933.

¶35   Both engagement letters contain similar language, and both encompass indemnification for criminal defense. The Bendinger letter was drafted and executed first and states, in pertinent part: “This letter will summarize and confirm the agreement for my firm, Bendinger, Crockett, Peterson & Casey to represent Susie Strohm’s interests in connection with the SEC civil complaint, referenced above, and in connection with further related investigations and litigation.” The Dorsey letter was executed some fourteen months later. Its operative section states: “[T]his letter confirms your engagement of Dorsey & Whitney, LLP . . . to represent Susie Strohm in connection with the SEC civil complaint, referenced above, and in connection with further related investigations and litigation including, among others, Anderton v. ClearOne Communications, et al. Civil No. 0300918066; and E-Bond Epoxies, Inc. Profit Sharing Plan and Trust v. Frances Flood et al. Civil No. 030906061.”

¶36 Though the word “criminal” is not used in either letter, their terms clearly encompass criminal litigation. In context, the “further related investigations and litigation” identified in both letters includes a criminal investigation and resulting trial. Under this clause, ClearOne agreed to indemnify Strohm for investigations and litigation related to the SEC civil complaint. The investigation and litigation most closely related to the SEC civil action was the federal criminal action. Indeed, the SEC civil action and the federal criminal action involved the same allegations and the same conduct. One can only be thought of as the natural result of the other. For this reason, we cannot agree with the district court

that the "scope and the purpose of the agreements" are facially ambiguous.

¶37 We likewise reject ClearOne's construction of "litigation" as referring exclusively to civil matters. The ordinary meaning of "litigation" is broad enough to encompass both criminal and civil actions, even though it may often be used to refer to civil actions. "Litigation" and "litigate" are defined as "[l]egal action or process" and "[t]o subject [something] to legal proceedings," AMERICAN HERITAGE DICTIONARY 763 (1981), or as "the practice of taking legal action" and "to carry on a legal contest by judicial process" or to "prosecute or defend by pleadings, evidence, and debate in a court," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1322 (2002). A criminal proceeding by the prosecution against a defendant fits easily and naturally within these definitions. A criminal proceeding is a legal action or process. It accordingly qualifies as "litigation" under the engagement letters.

¶38 The Dorsey letter's listing of three civil actions as included in "further related investigations and litigation" is not to the contrary. An otherwise broad, generic contract term may be restricted when modified by a clearly exclusive list. But this list is neither exclusive nor restrictive.[5] The Dorsey letter lists three civil cases as examples, but it does not limit indemnifiable actions to those specific claims or even claims like them. Instead, the three civil actions are described as being "among others."

¶39 The parties' use of the word "investigation" is further indication that they contemplated indemnification for criminal defense. "Investigation"—or "to investigate"—is defined as a "detailed examination" or "searching inquiry" or "to observe or study closely; inquire into systematically." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1189 (2002). Though this definition encompasses civil, non-official inquiries, "investigation" is used most often in a criminal context. In this way, "investigation"—like "litigation"—can refer to undertakings in either a criminal or civil matter, but here the word more commonly has a criminal flavor.

---

[5] *See Rodriquez v. Christus Spohn Health Sys.*, No. C-09-95, 2011 WL 4074475, at *4 (S.D. Tex. Aug. 18, 2011) (stating that use of the word "'including' followed by a list indicates that the list is not meant to be exclusive").

So, the engagement letters clearly contemplate that ClearOne would indemnify Strohm for the costs associated with investigating the criminal charges against her. Given that contemplation, only a tortured reading of the letters would dictate indemnification for both criminal and civil *investigation* but only for civil—not criminal—*litigation*. We accordingly affirm the district court's ruling requiring ClearOne to indemnify Strohm for her criminal defense costs under the engagement agreements.

¶40 Dorsey and Strohm ask us to go one step further. In the cross-appeal, they argue that once the district court determined that Dorsey was entitled to fees under the engagement letters, it could not change the contract terms to then limit those fees by time or based on the success of that representation. We agree.

¶41 In its ruling and order dated January 24, 2011, the district court held that "from the date of [the perjury] jury verdict ClearOne shall not be held liable . . . to pay [Strohm's] fees and expenses in the criminal case post-February 27, 2009, all of which must be attributed to the perjury count." Based on this language, it appears that the district court assumed that Strohm could not recover defense fees related to charges for which she was convicted. This would have been true if Strohm's—and Dorsey's—claims were limited to statutory indemnification. The statute under which Strohm qualifies for indemnification states that "a corporation shall indemnify a director [or, by operation of subsection 907, an officer] *who was successful, on the merits or otherwise, in the defense of any proceeding, or in the defense of any claim* . . . against reasonable expenses incurred by him in connection with the proceeding or claim with respect to which he has been successful." UTAH CODE § 16-10a-903 (emphasis added). Because Strohm was convicted of one count of perjury, this statute would operate to save ClearOne from indemnifying her for fees related to that charge.

¶42 But the district court did not limit Strohm and Dorsey's indemnification right to statutory indemnification. Rather, it held that the engagement letters "provid[ed] an alternative basis to require [ClearOne] to pay [Strohm's] reasonable legal fees incurred in her defense of federal criminal proceedings . . . or to reimburse her for fees paid to her counsel and co-plaintiff." So, Strohm and Dorsey can require indemnification for the perjury charge if the letter agreements contemplated that ClearOne would indemnify

Strohm for fees related even to unsuccessfully defended charges. We read the letters that way and accordingly reverse.

¶43  Nothing in the engagement letters purports to limit indemnification to successful challenges to criminal charges. Rather, the letters contemplate that Bendinger and then Dorsey would represent Strohm in her criminal defense and that Strohm and ClearOne would "be jointly and severally responsible for payment of all amounts billed under th[ese] Agreement[s]." "Where the terms and conditions of a contract are not unconscionable, and no fraud, duress, or misrepresentation is claimed, the courts must enforce all contracts as the parties have made them and not as the court thinks they should have been made." *Johnson v. Geddes*, 161 P. 910, 915 (Utah 1916).

¶44  So, while we agree with the district court's ultimate ruling on the contractual indemnification issue, we reverse its decision to limit Strohm's indemnification for criminal defense costs to those incurred before February 27, 2009. We accordingly remand to the district court for a determination of reasonable fees from that date to the conclusion of Strohm's appeal in the criminal case.

### III. TERMINATION OF DORSEY ENGAGEMENT AGREEMENT

¶45  ClearOne next argues that it ended its payment obligation under the Dorsey letter in November 2009, nine months after Strohm's jury verdict and six months before she was sentenced, and thus cannot be forced to indemnify Strohm for amounts incurred after that date. On this point, the district court determined that ClearOne did not have the power to "unilaterally terminate the attorney-client relationship" between Strohm and Dorsey. ClearOne contends that this was error. Specifically, ClearOne asserts that it never attempted to sever Strohm's attorney-client relationship with Dorsey, but sought only to end its obligation to pay Dorsey's fees.

¶46  The Dorsey engagement letter provides that "[Dorsey] will withdraw from representation upon *your* request." It also states that the letter confirms "*your* engagement of [Dorsey] to represent [Strohm]." ClearOne argues that because it is a party to the engagement letter, "your" as used in the letter refers to it and thus gives it the power to terminate its payment obligation. We do not read the letter that way.

¶47 Because the letter is addressed to both Strohm and ClearOne (through Keough, its CEO), "your" is best understood in its plural form, meaning ClearOne and Strohm. Under this reading, the "your" in Dorsey's promise to "withdraw from representation upon your request" refers to *both* Strohm and ClearOne. The Dorsey letter, therefore, does not give ClearOne the option of unilaterally asking Dorsey to withdraw. Rather, the terms of the engagement letter require a joint withdrawal request. And Strohm never asked Dorsey to withdraw. Thus, the district court was correct when it refused to enforce ClearOne's November 2009 letter attempting to force Dorsey's withdrawal.[6]

¶48 In briefing, ClearOne suggests that it never attempted to sever Strohm's attorney-client relationship with Dorsey, but only to end its own payment obligation to Dorsey. But the letter does not give ClearOne the option of ending its payment obligation. It simply gives the parties the option of *asking* Dorsey to "withdraw from representation." And the only representation that Dorsey undertook is representation of Strohm. Asking an attorney to withdraw from a case is vastly different from ending a requirement to pay for that attorney. While the letter contemplates the former, it says nothing about the latter.

¶49 We accordingly affirm the district court's ruling on the ground that ClearOne had no right under the letter agreement to

---

[6] Dorsey was representing Strohm and her interests and, by agreement, owed "all . . . professional responsibilities under applicable law . . . solely to" her. Allowing what amounts to a third-party payor to unilaterally sever an attorney-client relationship under these circumstances could be problematic. By rule, lawyers may not allow third-party payors to guide or interfere with proper representation of a client. *See* UTAH R. PROF'L CONDUCT 5.4(c) ("A lawyer shall not permit a person who recommends, employs or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services."). In so noting, we do not and need not reach the question whether a third-party payor's unilateral request for withdrawal would put counsel in jeopardy under this rule. Our conclusion, rather, is simply to note the potential for conflict under the rule and to observe that our construction of the engagement agreements avoids it.

unilaterally request Dorsey's withdrawal or to terminate its payment obligation to Dorsey.

## IV. REASONABLENESS OF FEE AWARD

¶50 ClearOne next contests the reasonableness of the district court's attorney fee determination in the criminal case, arguing that the award was excessive. We disagree.

¶51 Once the district court determined that Strohm and ClearOne were entitled to both statutory and contractual indemnification for Strohm's criminal defense, it acquired "broad discretion in determining what constitutes a reasonable attorney fee" under both the statute and the contract. *See Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 33, 52 P.3d 1179.[7] The evaluation of reasonableness is guided by the following considerations:

> 1. What legal work was actually performed?
>
> 2. How much of the work performed was reasonably necessary to adequately prosecute the matter?
>
> 3. Is the attorney's billing rate consistent with the rates customarily charged in the locality for similar services?
>
> 4. Are there circumstances which require consideration of additional factors, including those listed in the Code of Professional Responsibility?[8]

---

[7] *See also Foote v. Clark*, 962 P.2d 52, 54 (Utah 1998) ("Generally, attorney fees in Utah are awarded only as a matter of right under a contract or statute.").

[8] Utah Rule of Professional Conduct 1.5(a) lists the following "factors to be considered in determining the reasonableness of a fee":

> (1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

*Dixie State Bank v. Bracken*, 764 P.2d 985, 990 (Utah 1988) (footnotes omitted).[9]

¶52 Because the reasonableness of an attorney fee award "must be decided against a variety of factual backgrounds," the district court "is in a better position than an appellate court to gauge the quality and efficiency of the representation and the complexity of the litigation." *Valcarce v. Fitzgerald*, 961 P.2d 305, 317 (Utah 1998) (internal quotation marks omitted). Thus, "we will not reverse a trial court's determination of whether a fee is reasonable absent an abuse of discretion." *Bakowski*, 2002 UT 62, ¶ 33. Under this standard, a district court's ruling will not be reversed unless it "was beyond the limits of reasonability," *see Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269 (internal quotation marks omitted), or not "based on an evaluation of the evidence," *Cottonwood Mall Co. v. Sine*, 830 P.2d 266, 269 (Utah 1992).

¶53 ClearOne contends that the district court's fee award exceeds the limits of reasonableness. Specifically, ClearOne argues that the fees awarded in the criminal case are unreasonable be-

---

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

[9] *See Salmon v. Davis Cnty.*, 916 P.2d 890, 898 (Utah 1996) ("[S]ome of the factors relevant to attorney fee determinations . . . include the difficulty of the litigation, the efficiency of the attorneys in presenting the case, the reasonableness of the number of hours spent on the case, the fee customarily charged in the locality for similar services, the amount involved in the case and the result attained, and the expertise and experience of the attorneys involved." (internal quotation marks omitted)).

cause (1) certain lawyers' rates were too high, (2) the district court allowed unnecessary travel-related expenses, and (3) Dorsey's attorneys charged excessive hours in the criminal case.[10] We disagree.

1

¶54 ClearOne's first challenge to the district court's attorney fee award in the criminal case centers on its contention that Dorsey's out-of-town attorney rates were too high for the Salt Lake City market and higher than anticipated in the engagement agreements, which contemplated that Marsden would be Strohm's primary counsel. The district court set rates for two of Strohm's criminal counsel, William Michael and Christopher Shaheen, at $515 and $400 per hour respectively. According to ClearOne, rates for Strohm's attorneys should not exceed customary Utah rates and should, in no event, exceed the $360 per hour set for Marsden. In so arguing, ClearOne relies on the district court's statement in its March 2, 2010 Ruling and Order that, based on the Bendinger letter, the parties intended "that except in unusual circumstances, [Marsden's] rate would be the highest rate." In ClearOne's view, it was an abuse of discretion for the court to then conclude that

---

[10] ClearOne also argues that the district court erred when it employed the voluntary payment rule to conclude that ClearOne waived its right to contest the amount of attorney fees paid to Dorsey for its criminal defense work prior to commencement of the instant litigation. *See S. Title Guar. Co. v. Bethers*, 761 P.2d 951, 955 (Utah 1988) ("[A] person cannot recover back money which he has voluntarily paid with full knowledge of all of the facts, without fraud, duress, or extortion in some form." (internal quotation marks omitted)). But the district court made it clear that it was not relying on this rule when it declined to consider pre-litigation payments in its reasonableness assessment. According to the district court, the rule only buttressed its determination that Dorsey waived its right to contest the reasonableness of the pre-litigation charges by paying—and sometimes negotiating a reduction in—these charges. We agree with that determination. And though these already-paid fees could properly play a role in determining the reasonableness of the unpaid fees, the district court did not abuse its discretion by failing to consider them in that capacity.

Marsden's time would be billed at $360 per hour but that other attorneys' rates would be set even higher. We disagree.

¶55 The district court's determination of attorney billing rates, for both in-state and out-of-state attorneys, was careful and reasonable and certainly within the bounds of its discretion. In insisting that no attorney should have been billed at higher than $360 per hour, ClearOne asks us to hold the district court to an off-hand statement made in an order that neither intended nor attempted to determine the reasonableness of Dorsey's fee request. We see no basis for so doing, particularly when the district court itself limited the import of that statement in the same Ruling and Order. After stating that Marsden's rate would be the highest, the court explained that it "cite[d] these provisions for the sole purpose of putting the parties on notice that a reasonable fee determination is within the sound discretion of the trial court, but the Court will be guided as much as possible by contract language."

¶56 We see nothing in the district court's rate-setting analysis that exceeds the bounds of the parties' intentions as memorialized in the engagement letters. As the district court noted and as the terms of the engagement letters confirmed, "the ultimate form and complexity [of the criminal case] was not known" at the time the letter agreements were executed; "[i]t was a matter of professional responsibility for Dorsey to staff the case as it evolved, with lawyers best able to represent [Strohm];" and her lead criminal counsel, William Michael, "was an appropriate choice." In the engagement letters, the parties agreed that Marsden's law firm would "be entitled to decide who the appropriate firm employee is for any particular task" and that "hourly rates are subject to adjustment" and may "be affected by factors such as the amount involved in the representation, unusual time constraints, use of prior work product, and overall value of the services." In view of this language, approving out-of-state attorneys at higher billing rates is altogether reasonable.[11]

---

[11] Contrary to ClearOne's contention, there is nothing contradictory in the district court deciding both (1) that the engagement letters contemplated indemnification for criminal defense because Marsden wore "two or more hats" as both civil and criminal defense counsel and (2) that the complexity of the criminal case required different, higher priced counsel. That the case became un-

¶57 In determining reasonable attorney rates, the district court examined the experience and skill level of Strohm's attorneys, identified comparably skilled and experienced attorneys in the Salt Lake City market, and used rates charged by the latter as a reference to set reasonable rates for the former.[12] We find nothing unreasonable about this approach. Indeed, our caselaw recommends just such an inquiry. *See Dixie State Bank*, 764 P.2d at 990 (calling for consideration of whether an attorney's rate is "consistent with the rates customarily charged in the locality for similar services"). Its determinations on this score were bolstered by Dorsey's expert, who "validated both the selection of a highly skilled specialist and the reasonableness of Dorsey's rates in both [the criminal and collection] cases."[13]

2

¶58 Second, ClearOne challenges the district court's approval of travel-related expenses, asserting that they cannot be reasonably charged to ClearOne in light of the parties' understanding that legal services would be performed locally. This contention falters on similar grounds. The district court held, and we agree, that

---

wieldy and was more appropriately handled by others does not change the fact that Marsden did function as a criminal defense attorney when the parties signed the Bendinger letter.

[12] For instance, the district court described Strohm's lead defense attorney, Michael, as "in the upper echelon of criminal lawyers handling complex securities matters" and that "fair comparisons to [Michael], in the Salt Lake legal community, include James Jardine (Ray, Quinney & Nebeker) and David Jordan (Stoel Rives). Record evidence at comparable times include billing rates for both of $450 in 2008-2009." In similar fashion, the court reduced Mr. Shaheen's typical hourly rate from $475 to $400 "to more closely resemble his Salt Lake peers."

[13] ClearOne seems to challenge the district court's decision to credit Dorsey's expert on this issue instead of its own. But it is the district court's province to determine the weight and credibility of expert testimony. *Yelderman v. Yelderman*, 669 P.2d 406, 408 (Utah 1983). ClearOne's characterization of Dorsey's expert testimony as "vague and conclusory" falls far short of a persuasive challenge to the district court's determination on this score.

ClearOne agreed to "fund all reasonable and necessary expenses, and did not place any restrictions on the identity or geographic location of counsel." As discussed above, *supra* ¶ 56, ClearOne and Strohm agreed that Marsden's firm retained the discretion to decide how to staff Strohm's representation. And the choice to use Michael and others is, from where we sit, beyond reproach. As the district court noted, "the results speak for themselves."

¶59 Though the district court refused to limit or completely avoid billing the lodging and travel costs, it once again softened its ruling by giving "careful scrutiny" to the issue of travel time. Specifically, it noted that "travel time that does not include any preparation or related work done in behalf of the client is arguably of less value to the client" and determined that a 25 percent reduction would be applied to "travel time billed without any description that includes preparation or work on the case." This approach fits comfortably in the requirement that a district court consider work "actually performed" as well as other "circumstances which require consideration of additional factors." *See Dixie State Bank*, 764 P.2d at 990. We therefore hold that the court did not abuse its discretion by including travel-related expenses in Dorsey's attorney fee award or in limiting the fees related to travel time where no client work occurred.

3

¶60 In its final challenge to the reasonableness of the fee award in the criminal case, ClearOne asserts that Dorsey charged excessive hours, as purportedly evidenced by the disparity between the time charged in Strohm's case and in the case against Flood (Strohm's co-indictee). While Dorsey charged 8,199.25 hours for all of its timekeepers through the verdict, Flood's counsel charged only 4,331.75 for the same time period. As a threshold matter, we find this kind of comparison largely unhelpful. The factual disparities and nuanced differences in strategy inherent in cases involving different defendants, evidence, and defenses typically make one-to-one time comparisons relatively meaningless.

¶61 So while ClearOne also asserts that Dorsey has no justification for spending more hours defending Strohm than Flood's counsel spent defending her, the district court clearly found that it did, and we agree. In response to ClearOne's "simplistic" challenge, the district court noted that "Dorsey & Whitney, with its

greater resources and experience in the area took the laboring oar in document review and management, preparation of witness kits and trial exhibits, and similar work, the fruits of which were shared with [Flood's attorneys] under the Joint Defense Agreement." ClearOne completely ignores this point, but we cannot. Having agreed to this burden sharing and benefited from it, ClearOne cannot now hamstring Dorsey with it.

¶62 ClearOne also ignores another significant justification for the disparity in time charged: Dorsey was overwhelmingly successful in its defense of Strohm, while Flood was convicted on all counts brought against her. We cannot say that this result is due to Dorsey's work alone; undoubtedly differences between Strohm's and Flood's actions and responsibilities played a part in their respective criminal culpability. But our rules provide that the result obtained on behalf of a client can play a part in the reasonableness of the fee charged, *see* UTAH R. PROF'L CONDUCT 1.5(a)(4), and that factor accordingly weighs in favor of the reasonableness of the district court's award.

¶63 In sum, we hold that the district court's attorney fee award in the criminal case was reasonable. The parties agreed that Marsden's law firm would make all staffing decisions and that rates charged could increase over time to account for special circumstances. By adjusting attorney rates to the Salt Lake City market and by limiting travel expenses, the district court properly tempered its ruling to accommodate the reasonableness factors that serve as guides in this inquiry.

## V. CONSTRUCTION OF DORSEY ENGAGEMENT AGREEMENT

¶64 ClearOne next challenges the district court's ruling that the parties' engagement agreement contained provisions allowing 18 percent interest on unpaid charges and awarding Dorsey fees and costs incurred in enforcing the engagement agreements. Under the district court's ruling, the Dorsey letter—which contained no provision for 18 percent interest or for collection fees—"implicitly incorporated the terms of the Bendinger [letter]," which contained those terms, "changing only those elements of the former agreement that were specifically addressed." The district court reached this result by determining that the Dorsey letter was ambiguous but that extrinsic evidence revealed that the parties intended the

Dorsey letter to incorporate the terms of the Bendinger letter not specifically addressed therein.

¶65 We find no ambiguity in the Dorsey letter and read it to incorporate the Bendinger letter's interest rate and collection fee provisions.

¶66 The original engagement agreement (the Bendinger letter), provided that

> Clearone will pay the full amount of [Bendinger's] bill within thirty days after receipt. Any amount billed and unpaid after such thirty day period shall bear and accrue interest at the rate of 18% per annum from the date billed until paid.
>
> . . . .
>
> We shall be entitled to recover all reasonable costs expended in connection with collecting amounts due under this Agreement, including reasonable attorneys' fees.

¶67 When Marsden joined Dorsey & Whitney in early 2004, he sent ClearOne and Strohm a letter to memorialize this change. The letter states that "[a]s you know, I recently left the law firm of Bendinger, Crockett, Peterson & Casey, and joined the law firm of Dorsey & Whitney LLP. Our engagement agreement needs to be updated to reflect this move. The rest of this letter is intended to serve as the update." The letter then goes on to list, in general terms, the legal services that will be provided, along with the fees, disbursements, and billings. It does not, however, repeat or contradict the Bendinger letter's interest rate or collection fee provisions.

¶68 We interpret the Dorsey letter's "update" plainly to incorporate the terms of the Bendinger letter not specifically addressed or changed in the Dorsey letter. To "update" something is not "to supplant" or "to replace" it as ClearOne asserts. Instead, "update" is simply "to bring up to date." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2517 (2002). And the ordinary meaning of bringing something up to date is to account for intervening circumstances or to reflect the latest information or changes. *See id.* at 2519 (defining "up-to-date" as "extending up to the present time" or "including the latest facts"). Based on these definitions, it

seems clear that the Dorsey letter was meant to alter the parties' engagement agreement only to the extent that its provisions conflict with or change provisions of the Bendinger letter.[14] Because the Dorsey letter does not address or forbid interest on unpaid billed amounts or an allowance for amounts incurred to enforce the agreements,[15] those terms from the Bendinger letter remain part of the parties' engagement agreement.[16]

## VI. REASONABLENESS OF THE INTEREST RATE

¶69 ClearOne, however, challenges the enforceability of the interest rate provision, asserting that 18 percent interest is unrea-

---

[14] Though ClearOne suggests that it is not clear enough, we refuse to adopt a standard for incorporation that would require parties to use magic words to accomplish something that can be done in many ways and using many types of phrases. Indeed, in this and all matters of contract interpretation, we will continue to be guided—as we always have been—by the parties' intentions, as revealed in the ordinary meaning of the words they used.

[15] The Dorsey letter also neglects to mention the $5,000 retainer required by the Bendinger letter. Thus, that term was also incorporated into the Dorsey letter, and Dorsey could have rightfully required that ClearOne and Strohm provide a retainer. But Dorsey did not, and the time when Dorsey could have asked for one has passed.

[16] In briefing and at oral argument, ClearOne seemed to suggest that our Rules of Professional Conduct somehow require more clarity in contracts between attorneys and their clients than we require in contracts between regular parties. We disagree. While rule 1.5(b) requires attorneys to communicate to the client "[t]he scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible" and "[a]ny changes in the basis or rate of the fee or expenses," UTAH R. PROF'L CONDUCT 1.5(b), nothing in that rule or any other rule prescribes a higher standard of clarity for attorney-client fee agreements than that imposed on regular contracts. That is not to say that counsel could not or should not aspire to greater clarity. Our rules simply set a minimum standard. Bar members can and should seek to exceed the standard. But as for what is legally required, we read the rules as consistent with the requirements of contract law.

sonable in general because it is unconscionable and in this case because, in a contract between a client and its attorney, such an interest rate is unreasonable, unfair, and a violation of Utah Rule of Professional Conduct 1.5(e). We find no merit to these arguments and affirm the district court's decision to apply 18 percent interest to charges billed in the criminal case.

¶70 ClearOne must offer more than its bare assertion of unreasonableness to convince us to override the already-determined intentions of the parties to a contract. At base, ClearOne's position is simply that it shouldn't have to pay 18 percent interest because that rate is high. But it is not enough to assail a contract term on the grounds that it seems unfavorable to your interests. And if ClearOne thought that 18 percent interest was truly outside the bounds of acceptable rates—unconscionable as a matter of public policy—it was obligated to present expert testimony and/or established caselaw to that effect. It offered neither.

¶71 ClearOne's only arguable foothold seems to be in our Rules of Professional Conduct and the "higher ethical standard[]" that applies to attorneys "when contracting with their clients." *Infra* ¶ 101. We do not disagree that our rules require more from attorneys in certain contractual relationships than is required of non-attorneys. But nothing in our rules requires or even suggests that we can use that standard as a basis for invalidating otherwise-enforceable contractual provisions. Our Rules of Professional Conduct "define proper conduct for purposes of professional *discipline*" rather than establishing a higher duty as a matter of law. UTAH R. PROF'L CONDUCT, Preamble (emphasis added). They "simply provide a framework for the ethical practice of law" and "[f]ailure to comply with" that obligation "is a basis for invoking the disciplinary process" rather than a basis for contract tinkering. *Id.*

> Violation of a rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. . . . The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. . . . The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the

administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule.

*Id.*; *Archuleta v. Hughes*, 969 P.2d 409, 414 (Utah 1998) ("[T]he Utah Rules of Professional Conduct are not designed to create a basis for civil liability.").

¶72 Even if our court rules were relevant to this discussion, ClearOne has not established that any of our rules require us to alter the terms of its contract with Dorsey and Strohm. True, rule 1.5(a) precludes a lawyer from "mak[ing] an agreement for, charg[ing] or collect[ing] an unreasonable fee." UTAH R. PROF'L CONDUCT 1.5(a). But we fail to see how a rule that on its face sets standards for fees has any impact on interest that accrues on unpaid fees. Interest charged after a lawyer has assessed a fee does not become part of the fee itself.

¶73 None of our other rules of conduct are to the contrary. ClearOne's contract with Dorsey is not a contingent fee agreement, so rule 1.5(c) is inapplicable. *See infra* ¶ 101. It also does not involve a separate business transaction, so rule 1.8(a) is no help. *See infra* ¶ 102. While rule 1.5(b) does operate here to require both "the basis or rate of the fee and expenses" and "[a]ny changes in the basis or rate of the fee" to "be communicated to the client," no one has alleged such communication was absent. Rather, Justice Parrish's separate opinion seems to impose an extra "clarity" requirement that goes beyond mere communication to require "explicit" communication. *See infra* ¶¶ 101–05. This heightened clarity statement, however, has no basis in the rules or in our caselaw.

¶74 In any event, moreover, rule 1.5(a) itself lists reasonableness factors that appear to accommodate an interest rate of this altitude—"the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer," "the fee customarily charged in the locality for similar legal services," and "the time limitations imposed by the client or by the circumstances" incorporate notions of special circumstances, risk, and custom. *See* UTAH R. PROF'L CONDUCT 1.5(a). Absent evidence on these or other factors, we have no way to assess the reasonableness of the interest rate here, and thus no basis for striking it down.

¶75 Accordingly, we refuse to invalidate the interest rate provision in this case because ClearOne has failed to carry its burden of coming forward with evidence or authority to demonstrate that 18 percent interest is unreasonable.

## VII. ENFORCEABILITY OF THE COLLECTION FEE PROVISION

¶76 ClearOne likewise challenges the collection fee provision, arguing that the district court ran afoul of state public policy when it allowed Dorsey to collect attorney fees on its own engagement agreement. Specifically, ClearOne contends that our decision in *Jones, Waldo, Holbrook & McDonough v. Dawson*, 923 P.2d 1366, 1374 (Utah 1996), articulates a public policy basis for disallowing pro se lawyer-litigants from recovering their own attorney fees. Unlike the majority, I disagree and would hold that *Jones, Waldo* applies only in situations involving a true pro se lawyer-litigant. Because Dorsey is not such a litigant, *Jones, Waldo* is inapplicable, as the district court correctly concluded.

¶77 In *Jones, Waldo*, a law firm sued a former client in an attempt to collect attorney fees incurred representing the client in a divorce action. *Id.* at 1369–70. As part of this action, the law firm asked the court to award it attorney fees incurred in pursuing the collection action against the client. *Id.* at 1370. The trial court denied this request, and we affirmed, concluding that a lawyer-litigant enjoys an advantage of "competently present[ing] [a] claim without retained counsel" and that we were "loath to enhance that advantage by giving the lawyer-litigant recovery . . . as [the successful] party's attorney." *Id.* at 1374 (internal quotation marks omitted). We also identified "compelling public policy reasons" supporting the result. *Id.* at 1375.

¶78 Specifically, we decided that (1) "[f]inancing litigation by fee awards provides a new incentive to lawyers to increase their fees," and "gives rise to the danger of creating a 'cottage industry' for claimants . . . as a way to generate fees rather than to vindicate personal claims," and (2) creates a "captive client" who "has no control over the amount of time the attorney will spend or how it will be spent." *Id.* at 1375 (second alteration in original) (internal quotation marks omitted). In such situations, we held that there is no incentive for the lawyer-litigant to limit the total fee or "to explore less expensive collection alternatives." *Id.* In addition to these public policy concerns, the *Jones, Waldo* court "interpreted 'at-

torney fee' as denoting a monetary obligation (a fee) paid or owed from one person (a client) to another person who has provided legal representation (an attorney)" and determined that "an attorney's fee presupposes a relationship of attorney and client which does not exist in pro se situations." *Id.* (internal quotation marks omitted). Pro se lawyer-litigants, under this rationale, do not incur fees when they prosecute their own actions and so should not be reimbursed for those fees. *Id.*

¶79 I find *Jones, Waldo* distinguishable and inapplicable here. Unlike the law firm in *Jones, Waldo*, Dorsey is not purely a pro se litigant. *See id.* at 1369; *see also Smith v. Batchelor*, 832 P.2d 467, 473–74 (Utah 1992) (holding that a pro se attorney-litigant is not entitled to recover attorney fees for successful litigation). As a signatory to the engagement agreements, Strohm is "jointly and severally responsible" for fees owed to Dorsey, including those incurred in the collection action. Thus, Dorsey seeks in this case to vindicate not only its rights, but Strohm's as well.

¶80 This is an important difference in my view—one that Justice Parrish's separate opinion for the court dismisses too quickly. Dorsey has a client in this case. And the presence of a client interest largely alleviates the public policy and incentive concerns raised in *Jones, Waldo*. With Strohm on board, Dorsey cannot be seen to operate without client control because it is bound by rule and by agreement to represent Strohm professionally and ethically. *See* UTAH R. PROF'L CONDUCT 1.2(a) ("[A] lawyer shall abide by a client's decisions concerning the objectives of representation and . . . shall consult with the client as to the means by which they are to be pursued."); *id.* 3.2 ("A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."). Perhaps ClearOne had no client control, as the majority suggests. *See infra* ¶ 96. But Strohm did. And she has a real stake in the outcome of the collection action against ClearOne. Should Strohm's and Dorsey's claims against ClearOne prove unsuccessful, Strohm would be liable for Dorsey's unpaid fees. And, as the district court noted, Strohm's rights under the engagement agreements "cannot be vindicated unless she has competent counsel to assert those rights." Dorsey accordingly cannot be said to be pursing litigation "as a way to generate fees rather than to vindicate personal claims." *See Jones, Waldo*, 923 P.2d at 1375 (internal quotation marks omitted).

¶81 These distinctions leave only one element of the rationale in *Jones, Waldo*—that pro se lawyer-litigants do not incur fees. Strohm's presence in this action, however, renders that element inapplicable. Because Strohm will become liable to pay Dorsey's fees should Dorsey be unable to collect them from ClearOne, it can hardly be said that she has not incurred attorney fees in pursuing this collection action. She has certainly incurred them and, based on her engagement agreement with Dorsey, she is legally responsible to pay them. Whether she is likely to have the funds to pay those fees is another matter, but that was not at all a factor that drove our decision in *Jones, Waldo. See infra* ¶ 97. And I cannot agree that Strohm "had almost nothing to lose by supporting Dorsey's attempt to prevail against ClearOne." *See infra* ¶ 96. She had everything to lose. Perhaps Dorsey could not satisfy its entire debt by pursuing Strohm for her part of its collection fees, but it could ruin her financially and leave her with nothing.

¶82 Even if the rationale was applicable here, I would find it insufficient and unrealistic. Every minute a law firm (or lawyer) spends in a pro se collection action is a minute it cannot spend on other matters for paying clients. Thus, in some sense, law firms really do incur costs when they engage in pro se litigation. It is no answer to speculate that "in many cases firms are not utilizing their full capacity," so "undertaking extensive pro se litigation often does not, as a practical matter, result in lost opportunity costs." *See infra* ¶ 95. Such speculation may or may not be correct, but it does accept as true one important fact: that (at least some) firms incur costs when pursuing their own collection matters. How many that may be is unknowable, despite the majority's invocation of "most" and "often." *See infra* ¶ 95.

¶83 Thus, because this case does not implicate the core of the *Jones, Waldo* decision—public policy considerations concerning captive clients and improper incentives—I would conclude that nothing prevents Dorsey from seeking fees for time spent on collection efforts under the engagement agreement.

¶84 That does not mean, however, that my preferred approach would give Dorsey and firms like it an unfettered and ungoverned right to collect these kinds of fees. In circumstances like these, this court has always entrusted the calculation of fees and assessment for reasonableness to the discretion of the district court. *See Cottonwood Mall Co. v. Sine*, 830 P.2d 266, 269 (Utah 1992) (stat-

ing that attorney fees must be reasonable). The careful exercise of that discretion is sufficient to alleviate any of the lingering concerns expressed in *Jones, Waldo* and identified as the driving factors behind the majority's extension of *Jones, Waldo. Infra* ¶¶ 91–95. Lawyer-litigants who unnecessarily run up legal fees and employ tactics that serve only to prolong and complicate litigation should expect to face a challenge to the reasonableness of their fees under our caselaw. *See Salmon v. Davis Cnty.*, 916 P.2d 890, 893 (Utah 1996) (explaining that reasonableness of an attorney fee award is assessed based on factors such as the efficiency of the attorneys, the amount involved, and the result obtained).

¶85  I accordingly dissent from Section I of Justice Parrish's separate opinion for the court. I would affirm the district court's award in Dorsey's favor of fees incurred in seeking recovery under the letter agreements.

## VIII. CONCLUSION

¶86  For the foregoing reasons, we affirm the district court's determination that Utah Code sections 16-10a-903 and -907 and the parties' engagement agreements require ClearOne to indemnify Strohm, but reverse the district court's decision to limit Strohm's criminal defense cost indemnification to the fees and expenses billed before her perjury conviction. We also conclude ClearOne did not have the right to unilaterally end its payment obligation to Dorsey and Strohm and affirm the district court's reasonableness determination for fees in the criminal case. Next, we determine that the Dorsey letter incorporated the 18 percent interest and collection fee provisions from the Bendinger letter and affirm the district court's decision to enforce the interest rate provision. Finally, though a majority of the court invalidates the collection fee provision under *Jones, Waldo*, I would enforce it. We remand for further proceedings consistent with this opinion.

—————

JUSTICE PARRISH, Opinion of the Court as to Section I; dissenting as to Section II:

## ANALYSIS

¶87  While I concur in much of the analysis of the lead opinion, I respectfully disagree as to two issues. Specifically, I disagree with the lead opinion's conclusion that Dorsey is entitled to recover its attorney fees in the collection action because the factual

situation presented in this case implicates the public policy concerns raised by *Jones, Waldo, Holbrook & McDonough v. Dawson*, 923 P.2d 1366, 1374–75 (Utah 1996).  Even though this case does not involve a purely pro se lawyer-litigant, *see supra* ¶¶ 79–80, Strohm had no incentive to rein in Dorsey, who was therefore unconstrained by costs.  Our prohibition on fee collection by lawyer-litigants was designed to protect against this precise type of behavior.  My view on this issue has garnered a majority and so represents the holding of the court with respect to the recoverability of attorney fees in the collection action.

¶88  I also disagree with the lead opinion as to a lawyer's ethical obligations in contracting with his clients.  In contracting with clients, lawyers are bound by higher ethical standards than typical parties to a contract.  I believe that the Agreements in this case do not meet that heightened standard.

## I.  ATTORNEY FEES ARE NOT WARRANTED UNDER A NATURAL EXTENSION OF THE *JONES WALDO* RULE PROHIBITING THE COLLECTION OF ATTORNEY FEES BY PRO SE LAWYER-LITIGANTS

¶89  The lead opinion reads *Jones Waldo* narrowly and applies it only to those situations where the attorney or law firm is solely representing its own legal interests.  In this case, however, since the Agreements make Strohm jointly and severally responsible for Dorsey's attorney fees, including those incurred in the collection action, the lead opinion reasons that Dorsey is not "purely a pro se litigant" and that *Jones Waldo's* reasoning is inapplicable.  *See supra* ¶ 79.

¶90  The lead opinion finds this distinction dispositive because of the view that the presence of a client "largely alleviates" the public policy and perverse incentives for continued litigation that concerned us in *Jones Waldo*.  *Supra* ¶ 80.  It reasons that Dorsey "is bound by rule and by agreement to represent Strohm professionally and ethically" and should "Dorsey's claims against ClearOne prove unsuccessful, Strohm would be liable for Dorsey's unpaid fees."  *Supra* ¶ 80.  The lead opinion therefore concludes that Dorsey is not engaging in the kind of fee-driven litigation that we found unacceptable in *Jones Waldo*.

¶91  Though the lead opinion correctly concludes that Dorsey has a client in the formal sense, by distinguishing between the

purely pro se setting of *Jones Waldo* and the facts here, it eviscerates the underlying principles of *Jones Waldo*—protecting captive clients and curbing improper incentives. Particularly where, as here, the client has little or no incentive to act as a check on the behavior of her attorneys and there are few, if any, external incentives for the attorneys to control costs, the policies driving our holding in *Jones Waldo* are implicated.

¶92 We have long recognized the "general rule that pro se litigants should not recover attorney fees . . . regardless of their professional status." *Smith v. Batchelor*, 832 P.2d 467, 473–74 (Utah 1992). Because the lawyer-litigant's ability to competently present a claim without the aid of retained counsel is an inherent advantage, we are "loath to enhance that advantage by giving the lawyer-litigant recovery not only as a successful party, but also as that party's attorney." *Id.* at 474.

¶93 In *Jones Waldo*, we identified several important public policy concerns motivating the general prohibition against the collection of attorney fees for pro se attorney-litigants. First, permitting pro se lawyer-litigant fee recovery creates an incentive to artificially increase fees. *Jones, Waldo, Holbrook & McDonough v. Dawson*, 923 P.2d 1366, 1375 (Utah 1996). "In the case of a paying client, the lawyer who wants to retain client satisfaction will have an incentive to limit the total fee. That incentive is not present in fee award cases." *Id.* (internal quotation marks omitted). "A captive client . . . has no control over the amount of time the attorney will spend or how it will be spent. And [lawyer-litigants] ha[ve] no motivation to explore less expensive collection alternatives." *Id.*

¶94 A second, though related risk, is that permitting pro se lawyer-litigants to recover their fees will result in increased and protracted litigation. *Id.* Where a lawyer-litigant may finance her own litigation through fee awards, there is an incentive to increase fees, which in turn drives the "adversary's predictable response . . . to litigate the fee claim itself." *Id.* (internal quotation marks omitted); s*ee also Connor v. Cal-Az Props., Inc.*, 668 P.2d 896, 898 (Ariz. Ct. App. 1983) (reasoning that "attorneys representing themselves might be tempted to protract litigation for their own financial betterment"). This gives rise to the danger of "creating a 'cottage industry' for claimants . . . as a way to generate fees rath-

er than to vindicate personal claims." *Jones Waldo*, 923 P.2d at 1375 (internal quotation marks omitted).

¶95 Finally, we expressed reservations about characterizing the costs of pro se attorney litigation as fees that are "incurred." *Id.* "It is by no means self-evident that the time a lawyer spends on his own case represents fees 'incurred.'" *Id.* Because attorney fees are "a monetary obligation (a fee) paid or owed from one person (a client) to another person who has provided legal representation (an attorney) . . . attorney fee[s] presuppose[] a relationship of attorney and client which does not exist in pro se situations." *Swanson & Setzke, Chtd. v. Henning*, 774 P.2d 909, 910 (Idaho Ct. App. 1989) (internal quotation marks omitted). Further, because in many cases firms are not utilizing their full capacity, undertaking extensive pro se litigation often does not, as a practical matter, result in lost opportunity costs. Rather, such a firm is incentivized to use its extra capacity, in the form of lawyers in search of billable hours or new associates whose time would not otherwise be billed, to pursue pro se litigation with the hope that the firm will reap a significant fee award, with zero downside risk. We therefore reasoned in *Jones Waldo* that "a law firm does not 'incur' fees when it uses its own attorneys in a collection action." 923 P.2d at 1375.

¶96 Though Dorsey technically has a client in Strohm, the public policy concerns motivating the general prohibition against the collection of attorney fees for pro se attorney-litigants are directly implicated by the facts here. ClearOne, as the entity underwriting the cost of Strohm's litigation, is the captive client that "has no control over the amount of time the attorney will spend or how it will be spent." *Id.* Dorsey had no incentive to limit the hours it expended or the costs it incurred to prosecute its collection action against ClearOne. Nor was Strohm motivated to limit Dorsey's expenditures in the collection action. Because ClearOne was jointly and severally liable under the Agreements for the underlying fees and was statutorily required to indemnify Strohm for her fees in both the underlying criminal and the subsequent collection action, Strohm had almost nothing to lose by supporting Dorsey's attempt to prevail against ClearOne.

¶97 As a practical matter, it is far more likely that Dorsey would collect its nearly one million dollar fee from ClearOne, a large corporation, than from Strohm, a private individual. Even

lacking an explicit agreement between them that Dorsey would not attempt to collect any residual unpaid fees from Strohm, it is highly unlikely that Dorsey would have expended over eight hundred thousand additional dollars to attempt to collect fees from Strohm in the event that Dorsey was unsuccessful in its collection action against ClearOne. And the higher the collection fees became—pursuant to the 18 percent interest rate specified in the Agreement—the less likely Strohm would be able to pay the fees for which she was jointly and severally responsible and the less likely Dorsey would have been to pursue her. And, in any event, Strohm was statutorily entitled to indemnity from Clear One.

¶98 These realities negate, as a practical matter, Strohm's incentive to reign in her attorneys. Indeed, they created a perverse incentive for her to refrain from limiting Dorsey's efforts. Further, because Dorsey employed its own attorneys rather than those of another firm, Dorsey had nothing to lose in protracted litigation. As we explained in *Jones Waldo*, Dorsey's use of in-house attorneys means that it does not incur fees. *Id.* As a result, neither Strohm nor Dorsey had any incentive to limit the total fee generated by the collection action against ClearOne—a result squarely within the scope of *Jones Waldo.*

¶99 While *Jones Waldo* does not govern every collection action, there are instances outside of the purely pro se lawyer-litigant setting that, because of their peculiar factual bases, raise concerns related to captive clients and unconstrained litigation that *Jones Waldo* was meant to curb. Though the lead opinion reasons that "[w]ith Strohm on board, Dorsey cannot be seen to operate without client control," Strohm was disincentivized to control Dorsey's escalating costs. *Supra* ¶ 80. Rather, Dorsey was incentivized to prolong litigation in order to assess and collect its fees from ClearOne. Therefore, even though this case is not directly within the facts presented in *Jones Waldo*, the policy interests motivating that case extend naturally to the facts present here, and its prohibition of the award of attorney fees to pro se lawyer-litigants should also apply. We therefore hold that Dorsey is unable to recover its attorney fees in the collection action.

JUSTICE PARRISH, dissenting

## II.  IN CONTRACTING WITH THEIR CLIENTS, ATTORNEYS ARE BOUND BY HIGHER ETHICAL CONSIDERATIONS THAN TYPICAL PARTIES TO A CONTRACT

¶100 I disagree with the lead opinion's analysis regarding the standard to be applied to attorneys entering into fee agreements. *Supra* ¶ 64.  While I agree that the Dorsey letter incorporates the provisions of the Bendinger letter, the interest rate and collection provisions contained in the letters raise concerns about a lawyer's ethical role when drafting such engagement agreements and I believe the issue should not be resolved on summary judgment.

¶101 Despite the lead opinion's assertion that "nothing in [the Rules of Professional Conduct] prescribes a higher standard of clarity for attorney-client fee agreements than that imposed on regular contracts," *supra* ¶ 68 n.14, the attorney-client relationship is not analogous to an ordinary contractual relationship.  Indeed, the Utah Rules of Professional Conduct (Rules) contemplate higher ethical standards for attorneys when contracting with their clients than do typical laws of contract formation.  For instance, we require that a contingent fee agreement "be in a writing signed by the client" and that it "state the method by which the fee is to be determined."  UTAH R. PROF'L CONDUCT 1.5(c).  Such formalities are not required in typical contract formation, even when such a contract is based on a contingent return.

¶102 Similarly, subject to certain limited exceptions, "[a] lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client."  *Id.* 1.8(a).  Again, there is no such prohibition on typical contracting parties, nor is there such a prohibition when lawyers are contracting with parties whom they do not represent.  Finally, under the Rules, lawyers may not "solicit any substantial gift from a client," nor may they prepare instruments conveying substantial gifts unless they are related to the client.  *Id.* 1.8(c).  Such restrictions are simply inapplicable to non-lawyers.  As stated by the California Court of Appeal, "[t]he Rules of Professional Conduct are not only ethical standards to guide the conduct of members of the bar; but they also serve as an expression of public policy to protect the public."  *Fields v. Ratfield*, No. C09-01125, 2012 WL 5359775, at *9 (Cal. Ct. App. Nov. 1, 2012) (internal quotation marks omitted).

¶103 Such protection of the public extends to the clarity of a lawyer's communication with his or her client on the issue of fees. I agree with the lead opinion that lawyers can and should aspire to "great[] clarity" in their dealings with clients, but I believe that the "minimum standard" set by the Rules is higher than that which the lead opinion advocates. *Supra* ¶ 68 n.16 ("[A]s for what is legally required, we read the rules as consistent with the requirements of contract law."). Under the Rules, "the basis or rate of the fee and expenses for which the client will be responsible shall be communicated, preferably in writing, before or within a reasonable time after commencing the representation . . . . Any changes in the basis or rate of the fee or expenses shall also be communicated to the client." UTAH R. PROF'L CONDUCT 1.5(b). In this case, however, the communication between Dorsey, Strohm, and ClearOne is anything but explicit.

¶104 For example, Dorsey's decision to bring in what the district court determined to be overpriced out-of-state counsel was not adequately communicated. *See supra* ¶ 54. Because the Dorsey letter did not explicitly contemplate the use of expensive outside counsel, neither Strohm nor ClearOne were on notice that Dorsey would hire such counsel and bill them at rates hundreds of dollars higher than those in the local area. Such exorbitant fees were in contrast to the language of the letter stating that Dorsey's "fees are ordinarily based on our usual and customary hourly rates [of approximately $255]." And though the Dorsey letter stated that "[o]ur hourly rates are subject to adjustment from time to time," hiring high-priced out-of-state counsel surely cannot constitute an "adjustment" to Dorsey's typical hourly rates.

¶105 The lack of clarity in agreements such as those at issue here is entirely within the control of the attorneys drafting the agreements. And when lack of clarity leads to issues of notice or misplaced expectations, it is the clients, rather than the drafting attorneys, who are negatively impacted. I believe that attorneys should be held to a higher standard. They should not just strive for "great[] clarity" in their agreements, but should not be benefitted when they neglect to draft agreements that lack such clarity.

## CONCLUSION

¶106 The holding of the court is that Dorsey is not entitled to recover its attorney fees in the collection action. Attorney fees

were not warranted because the facts here present a natural extension of our precedent prohibiting collection of attorney fees by pro se lawyer-litigants. Although Dorsey technically has a client, the incentives are such that there was essentially no check on its expenditures.

¶107 I respectfully dissent from the lead opinion as to the standards to be applied to lawyers in drafting fee agreements with their clients. Lawyers should be, and often are, held to higher ethical standards than other parties to a contract.

_____