JONES, WALDO, HOLBROOK & McDONOUGH, a Utah professional corporation, Plaintiff, Appellee, and Cross–Appellant,

v.

Jerilyn Shelton DAWSON, Defendant, Appellant; and Cross–Appellee.

No. 940595.

Supreme Court of Utah.

Sept. 6, 1996.

D. Williams Ronnow, John J. Walton, St. George, for plaintiff.

Joseph Harlan Burns, Cedar City, for defendant.

HOWE, Justice:

Defendant Jerilyn Shelton Dawson appeals from a judgment for attorney fees entered against her based on findings that plaintiff law firm Jones, Waldo, Holbrook and McDonough did not establish a "cap" on its attorney fees for representing Dawson in her divorce action. She assails the trial court's decision that collateral estoppel and res judicata barred her from relitigating in this action the amount of attorney fees which the divorce court found reasonable in the underlying divorce action. The judgment awarded plaintiff fees for the trial and appeal representation of Dawson in her divorce action, together with interest· and court costs, and granted plaintiff foreclosure of its attorney's lien on her residence. Plaintiff cross-appeals from the trial court's judgment that it is not entitled to attorney fees for pro se representation in this collection action against Dawson and from the court's ruling during trial that Dawson's general denial in her answer was sufficient to raise a defense on that issue.

### FACTS

Dawson contacted Michael Shaw of plaintiff law firm to defend her in a divorce action filed by her husband Gary Shelton. Shaw had her sign a retainer agreement. He explained the agreement to her as he filled in the blanks but did not give her a copy. The agreement provided for the payment of a $500 retainer plus "reasonable fees," interest on overdue fees, and an attorney's lien against the proceeds of the action in the event of nonpayment. The agreement also stated that the client would be responsible for all "collection costs" associated with delinquent accounts, including "attorneys' fees incurred in the enforcement of th[e] agreement." Shaw testified that he told Dawson that plaintiff would conduct its own collection in the event of her default and would hold her responsible for those fees.

Shaw informed Dawson that his current rate was $100 an hour, although no figure appears in the agreement. She told him that she had a prenuptial agreement which she intended to honor. She testified that he told her at the initial meeting that the total charges would probably not exceed $10,000 and in no event would be more than $15,000. Shaw also told Dawson he intended to ask the court for an award of attorney fees from her husband. Dawson asserts that she retained Shaw as counsel on the basis of those representations. She paid the retainer shortly after the first meeting.

Following a temporary restraining order hearing, Shaw and Dawson paused to talk on the way out of the courthouse. Dawson asked Shaw, "[H]ow much is all this going to cost me?" Shaw later testified that he replied, "I think you should count on something in the nature of 15 to $18,000, assuming we don't get into SVS Corporation." He then corrected himself, stating: "I think I misstated that. I believe my—my good faith estimate is—what I would call it at that time was in the nature of 10 to $12,000 to get the case tried. And if we had to get into SVS Corporation, she should expect more like 15 to $18,000." Alta Graham, a friend with whom Dawson was staying who had referred her to Shaw, was with them at the courthouse. Graham testified that Shaw told Dawson that since she and her husband had not come to an agreement on settlement, "they would have to go back into court, and that it could be as high as five to $10,000 if they had to

really struggle." At this point, Graham testified that both women "gasped" at the amount. Shaw added that "if we attack the corporation, it could be as high as 15 or 20." Dawson's testimony substantiated Graham's. Dawson further testified that she told Shaw from the beginning that she had no intention of attempting to attack the corporation because of the prenuptial agreement and that "$20,000, to me, was unbelievable for a divorce."

As fees mounted during the divorce proceedings, Dawson became increasingly concerned. Since she was doing much of the work on the assets herself, she felt that some of Shaw's efforts were duplicative and wasteful. When she expressed her alarm to Shaw, he said that they would ask for fees from her husband. Meanwhile, she fell behind in her payments to Shaw and by the time of the divorce trial, the fees charged had reached $33,901. The divorce court found that amount reasonable but awarded Dawson judgment against her husband for only $18,500 in attorney fees.[1] The court also awarded Dawson the marital home, the down payment for which had been substantially provided by the sale of her premarital home, and rehabilitative alimony of $1,400 per month for two years, for a total of $33,600.

Shelton subsequently appealed. Shaw began work on the appeal, adding another $12,586.42 in fees. Relations between Dawson and Shaw continued to deteriorate. When Graham expressed concern to Shaw about the contention over the bill, he replied, "[T]he one thing Jeri doesn't understand is that I am obligated to bring a certain amount into the firm each month." When Graham pointed out in a later telephone conversation that Dawson had no funds with which to pay plaintiff, Shaw responded that "this is a three-and-a-half million dollar [estate]. I'm sure there's assets there."

Dawson, who had previously sold real estate, was relying on the rehabilitative alimony for living expenses while she obtained her Utah real estate license and built up a customer base. However, Shaw filed a notice of attorney's lien on Dawson's home and upon the alimony payments pursuant to section 78–51–41 of the Utah Code. Due to the attorney's lien, the trial court clerk issued the alimony checks to Dawson and the law firm jointly. Dawson signed the first check over to the firm. Plaintiff retained the two following checks when Dawson ignored its demands that she sign them so they could be disbursed. Subsequently, with the appeal still pending, plaintiff withdrew from Dawson's representation for nonpayment of fees.

At that point, plaintiff returned the two checks it had been holding to the clerk of the court and requested her to retain all subsequent checks. The result was that the checks were held in a noninterest-bearing account and none of the payments ever reached Dawson. Meanwhile, plaintiff continued to charge Dawson twelve percent interest on her unpaid balance.

Dawson was obliged to hire substitute counsel to defend against Shelton's appeal. Plaintiff retained Dawson's file as a lien against her unpaid fees. Consequently, she was unable to realize the full benefit of the cost involved in the preparation of the file. Shaw had been preparing to supplement the trial court's fifty-three pages of findings, expressing the opinion that not doing so would invite remand. However, he did not do so and Dawson's substitute counsel Joseph Harlan Burns successfully defended the appeal without benefit of either Dawson's file or supplemental findings.

Subsequently, plaintiff filed this action against Dawson, seeking judgment for a balance of fees owing of $43,143.48, an order of foreclosure of attorney's liens against Dawson's home, and "reasonable costs of collection, court costs, and reasonable attorneys' fees incurred in the prosecution of this action and through foreclosure, as appropriate." Plaintiff then moved for summary judgment.

1. It is interesting to note that Shelton's fees to his counsel for the divorce action were $19,640, which corresponds closely to Shaw's original high-end projection.

The trial court denied summary judgment, ruling that the retainer agreement was not fully integrated since it did not set a specific fee and appeared "to create an open ended arrangement whereby the law firm may charge any amount it deems reasonable." Because the agreement established neither hourly rates nor a cap on the fees, the court found that there was a genuine issue of material fact and ruled that parol evidence would be admitted at trial to establish the intent of the parties. Plaintiff subsequently moved to have the court clerk release the alimony payments to plaintiff. Defendant objected, and the court denied plaintiff's motion, ruling that a motion regarding alimony disbursement was not properly before the court since it related to the divorce action.

The court granted a motion to bifurcate the trial and addressed the question of the cap on the fees, followed by the reasonableness of attorney fees sought by plaintiff. The court found that no fee cap had been established and ruled that plaintiff was entitled to fees of $33,901 for representing Dawson in the divorce trial and $12,586.42 for its work on appeal; that the fees were reasonable; and that under the principles of res judicata and collateral estoppel, Dawson could not relitigate or otherwise challenge the amount of plaintiff's attorney fees found reasonable in the divorce decree. The court held that plaintiff was not, however, entitled to attorney fees from Dawson in the collection action. The court additionally awarded interest to plaintiff on the unpaid balance, together with costs, and granted foreclosure of plaintiff's attorney's lien on Dawson's home.

Defendant now appeals from the judgment against her, and plaintiff cross-appeals from the trial court's denial of pro se attorney fees and from the ruling that a general denial on the issue of attorney fees was sufficient to raise the affirmative defense of the impermissibility of fees for pro se representation.

■ Under Utah Rule of Civil Procedure 52(a), we review the factual findings of the trial court under the clearly erroneous

standard. "A finding is clearly erroneous if it is 'against the clear weight of evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made.'" *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1378 (Utah 1995) (quoting *State v. Walker*, 743 P.2d 191, 193 (Utah 1987)). We review the trial court's legal determinations for correctness, granting them no deference. *Standard Fed. Sav. & Loan Ass'n v. Kirkbride*, 821 P.2d 1136, 1137 (Utah 1991).

## ANALYSIS

### A. Collateral Estoppel

■ Defendant contends that collateral estoppel does not bar her from now challenging the reasonableness of plaintiff's fees, as found by the trial court. In *Sevy v. Security Title Co.*, 902 P.2d 629 (Utah 1995), we explained that collateral estoppel, or issue preclusion, prevents the parties from relitigating issues resolved in a prior related action. The party seeking collateral estoppel must satisfy four requirements. First, the issue challenged must be identical in the previous action and in the case at hand. Second, the issue must have been decided in a final judgment on the merits in the previous action. Third, the issue must have been competently, fully, and fairly litigated in the previous action. Fourth, the party against whom collateral estoppel is invoked in the current action must have been either a party or privy to a party in the previous action. *Id.* at 632–33 (citing *Timm v. Dewsnup*, 851 P.2d 1178, 1184 (Utah 1993)). "Issue preclusion arises in a second action on the basis of a prior decision when the same 'issue' is involved in both actions; the issue was 'actually litigated' in the first action, after a full and fair opportunity for litigation," and the issue was actually decided by a sufficiently final and valid disposition on the merits. 18 Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 4416 (1981).

We defer to the trial court's factual findings that the issue of the reasonableness of

$33,901 in attorney fees was identical in the divorce action and in the subsequent trial, that there was a final judgment on the mer-its, and that Dawson was a party to the divorce action. It is not clear, however, that the reasonableness of attorney fees was fully and fairly litigated in the sense required for issue preclusion.

In *Berry v. Berry,* 738 P.2d 246, 249–50 (Utah Ct.App.1987), the Utah Court of Appeals applied collateral estoppel on the basis that "[i]f appellant failed to fully raise her arguments under the Uniform Partnership Act before the trial court and the Supreme Court, it was not because she did not have opportunity to do so." In the case at hand, however, Dawson had no real opportunity to raise her arguments on the reasonableness of fees in the divorce proceeding. It is unrealistic to expect that Dawson could have challenged the reasonableness of her own attorney fees at the divorce trial where plaintiff was her only advocate. Nothing in the record before us indicates that Shelton challenged the reasonableness of Dawson's attorney fees for the divorce action. Therefore, Shaw's affidavit on attorney fees was uncontested and not subjected to cross-examination.

■ Plaintiff maintains that "as Defendant in the prior action, Dawson, represented by counsel, had the full benefit of due process and zealous representation." But this "due process and zealous representation" was in defense of plaintiff's own attorney fees. Plaintiff had the benefit of due process and zealous representation of its own cause, but in any challenge to the fees, Dawson had no advocate at all. Since the reasonableness of attorney fees was not "competently, fully, and fairly litigated in the previous action," *Sevy,* 902 P.2d at 632, the trial court erred in applying collateral estoppel against Dawson.

■ There remains, however, plaintiff's assertion that "Dawson now appears before the same court in a separate action and seeks to challenge and deny the evidence presented for her benefit in the prior litigation" which was "submitted under oath in the form of an affidavit for attorney's fees." Although plaintiff makes these claims in support of collateral estoppel, judicial estoppel is the doctrine which "prevents a party from seeking judicial relief by offering statements inconsistent with its own sworn statement in a prior judicial proceeding." *Salt Lake City v. Silver Fork Pipeline,* 913 P.2d 731, 734 (Utah 1995) (citing *Condas v. Condas,* 618 P.2d 491, 496 (Utah 1980)). "The purpose of judicial estoppel is to uphold the sanctity of oaths, thereby safeguarding the integrity of the judicial process from conduct such as knowing misrepresentations or fraud on the court." *Id.* We held in *Silver Fork,* however, that "this purpose is not served in cases such as this where there is no evidence that the party against whom judicial estoppel is sought knowingly misrepresented any facts in the prior proceeding and where the party seeking to invoke judicial estoppel had equal or better access to the relevant facts." *Id.* It was plaintiff, not Dawson, that had access to the relevant facts regarding the attorney fees, prepared the affidavits, and maintained that the fees were reasonable. Dawson lacked even an opportunity to misrepresent those facts. Therefore, judicial estoppel does not rescue plaintiff's argument, and Dawson is not barred from challenging the reasonableness of plaintiff's fees. The determination of reasonable fees should be made entirely de novo, free from any influence by the prior divorce action adjudication.

### B. Cap on Fees

The trial court found that the retainer agreement was not a fully integrated agreement because it did not specify either an hourly rate or a total fee for representing Dawson in the divorce. There is no dispute, and the trial court found, that $100 per hour for Shaw's time was reasonable. However, the parties disagree as to whether there was a subsequent oral agreement between them capping the fees at $18,000. Both parties rely on Shaw's testimony as to what he told Dawson after their initial court appearance when she asked him, "How much is all of this

going to cost me?" Answering that question, Shaw testified at trial:

> At that point, I said, "Of course the hourly rate is hard to determine exactly how much something is going to cost. We don't know what they're going to do. But I think you should count on"—which I took her question to mean—"I think you should count on something in the nature of $15,-000 to $18,000, assuming we don't get into SVS Corporation."

At that point, Shaw sought to correct his testimony. He testified:

> I think I misstated that I believe my—my good faith estimate is—what I would call it at that time plus in the nature of $10,000 to $12,000 to get the case tried. And if we had to get into the SVS Corporation, she should expect more like $15,000 to $18,000.

He then testified that he "did have to get into the SVS Corporation." The trial court concluded that the parties did not ever agree on a fee cap and that the foregoing testimony of Mr. Shaw indicated only his estimate of the total fees at that time.

Dawson assigns as error the trial court's conclusion. She emphasizes that Shaw's testimony was that "[y]ou should count on" the amounts which he stated. She asserts that she was entitled to rely upon those amounts since he stated that she should "count on" them. Plaintiff counters that Shaw lacked the authority to enter into a fixed fee agreement without approval from the executive committee of plaintiff's board of directors, an approval he did not seek. Dawson responds that an uncommunicated lack of authority is irrelevant to her understanding of the agreement.

 In reviewing the trial court's conclusion that a cap on fees was never agreed to by the parties, we are guided by abundant case law that fee agreements between lawyers and clients should be carefully scrutinized to ensure that they are fair and that they have been entered into without any misrepresentation or other improper conduct. *See generally Skeen v. Peterson,* 113 Utah 483, 196 P.2d 708, 712 (1948). Our own court of appeals in *PADD v. Graystone Pines Homeowners Ass'n,* 789 P.2d 52, 56 (Utah Ct.App.1990), construing a written fee agreement between an attorney and his client, quoted with approval the following rule enunciated in *Hitchcock v. Skelly Oil Co.,* 201 Kan. 260, 440 P.2d 552, 554 (1968): "It is the general rule that in construing a contract between attorney and client, doubts are resolved against the attorney and the construction adopted which is favorable to the client." In *McAdam v. Dynes,* 442 N.W.2d 914, 916 (N.D.1989), the court held that because of the confidential nature of the attorney-client relationship, "compensation agreements made during the existence of that relationship are closely scrutinized and construed most strongly against the attorney." *See* 7A C.J.S. *Attorney & Client* § 306 (1980) (stating that foregoing rules are "general rule" followed in most cases). The rule is often invoked in disputes between attorneys and clients arising out of ambiguities in a written fee agreement. The rule that doubts are to be resolved against the attorney comports with the general rule of contract interpretation that ambiguous language is to be construed against the drafter:

> In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.

Restatement (Second) of Contracts § 206 (1981); *see also* 3 Arthur L. Corbin, *Corbin on Contracts* § 559 (1960) (to the same effect).

 Turning to the instant case, the written retainer agreement was silent as to whether the parties intended that fees be capped. If a cap was agreed to, it was by virtue of a subsequent oral agreement. The parties are in dispute as to the legal effect of the discussion they had when Dawson raised the subject following their initial court appearance. We are persuaded that the foregoing rules of interpretation should apply even though the agreement, if any, was oral-

ly made. Therefore, because of the professional relationship that Shaw had with his client, his oral expressions to her must be construed in her favor and against him. Since the written agreement did not specify a total fee, or indeed, even an hourly fee, it was quite natural for Dawson at some point to inquire as to her future liability. At that point, Shaw's relationship to Dawson required him to be clear in his answers to her inquiry. In view of his professional status and his opportunity to clearly refuse to state any cap on his fees, Shaw's statement to his client that she could "count on" not more than $18,000 must be construed against him and held binding. This conclusion is in accord with *Centurian Corp. v. Ryberg, McCoy & Halgren,* 588 P.2d 716, 717 (Utah 1978), where we held a law firm to a contractual fee agreement, in spite of the trial court's finding that a greater fee would have been "reasonable." See also *Grossman v. State Bar,* 34 Cal.3d 73, 192 Cal.Rptr. 397, 399, 664 P.2d 542, 544 (1983), where the court limited an attorney to the fee agreed in his contract with his client, even though the work became more onerous than originally anticipated, where the client had not consented to renegotiate the fee. There the attorney was disciplined by the court for attempting to take a forty percent recovery when the contract allowed only thirty-three percent.

We therefore direct that the judgment be amended to fix the total fee for plaintiff's representation of Dawson in the trial court in the divorce action at $18,000.

### C. General Denial

▪ Dawson's answer to plaintiff's complaint generally denies, by numbered paragraph, plaintiff's claims for attorney fees. Plaintiff contends on its cross-appeal that this general denial was insufficient to raise the "defense or avoidance that the law firm could not claim attorney's fees for its pro se litigation of the collection action."

Plaintiff relies on Utah Rule of Civil Procedure 8(c), which governs the pleading of an affirmative defense. The rule requires:

[A] party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, [and] waiver and any other matter constituting an avoidance or affirmative defense.

"However, rule 8(c) does not elaborate this catchall statement and thus offers no assistance in defining what constitutes 'an avoidance or affirmative defense.'" 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1271 (1990).[2] "[A]t common law, matter in avoidance of the action may be set up by a plea in confession and avoidance.... In other words, this defense concedes that plaintiff once had a good cause of action, but insists that it no longer exists." 61A Am.Jur.2d *Pleading* § 152 (1981). In *Creekview Apartments v. State Farm Insurance,* 771 P.2d 693 (Utah Ct.App.1989), the court of appeals required that a defense based on a contractual limitation be affirmatively pleaded. Plaintiff's reliance upon that case is misplaced, however, because *Creekview* is not analogous to the instant case. In *Creekview,* the defendant attempted to raise a new defense, independent of the allegations in the pleadings, in its motion for summary judgment. The court stated that "a new matter becomes an 'avoidance' when it suggests that a plaintiff's complaint is invalid for other reasons not embraced by the pleadings." *Id.* at 695.

▪ However, Dawson did not admit the cause of action and then plead matters in avoidance as is required for a confession and avoidance. Instead, she denied the cause of action, as is appropriate under a general denial. Utah Rule of Civil Procedure 8(b) states that a pleader "may generally deny all the averments except such designated averments or paragraphs as he expressly admits;

---

**2.** The Utah rule is "substantially the same as rule 8, F.R.C.P." Utah R.Civ.P. 8, at 22 (Compiler's Notes).

but when he does so intend to controvert all its averments, he may do so by a general denial." Therefore, a defense that merely controverts plaintiff's prima facie case is negative in character and should be pleaded in accordance with rule 8(b). A rule 8(c) affirmative defense, in contrast, "raises matter outside the plaintiff's prima facie case." *General Ins. Co. of Am. v. Carnicero Dynasty Corp.*, 545 P.2d 502, 502 (Utah 1976).

 Under modern pleading rules, the scope of a general denial is very broad. We held in *Cheney v. Rucker*, 14 Utah 2d 205, 211, 381 P.2d 86, 91 (1963), and have reiterated on numerous occasions since that although rule 8(c) is valuable for assuring that the issues to be tried are clearly framed, it is

> not the only rule in the book of Rules of Civil Procedure. They must all be looked to in the light of their even more fundamental purpose of liberalizing both pleading and procedure to the end that the parties are afforded the privilege of presenting whatever legitimate contentions they have pertaining to their dispute.

Thus our interpretation of the pleading rules must turn upon the fact that "[w]hat [the parties] are entitled to is notice of the issues raised and an opportunity to meet them. When this is accomplished, that is all that is required." *Id.; see also Union Bank v. Swenson*, 707 P.2d 663, 667 (Utah 1985); *F.M.A. Fin. Corp. v. Build, Inc.*, 17 Utah 2d 80, 404 P.2d 670, 672 (1965). In *Williams v. State Farm Insurance Co.*, 656 P.2d 966, 971 (Utah 1982), we reaffirmed our holding in *Cheney*, stating that the rules " 'allow examination into and settlement of all issues bearing upon the controversy,' with latitude for proof that extends beyond the pleadings, where appropriate." (Citing *Cheney*, 14 Utah 2d at 211, 381 P.2d at 91.) These holdings reflect the philosophy of Utah Rule of Civil Procedure 53(c), which states that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."

Other jurisdictions have similarly interpreted their own analogous state and federal rules. The Nevada Supreme Court held in *Schmidt v. Sadri*, 95 Nev. 702, 601 P.2d 713, 715 (1979), that "a defendant is entitled under a general denial, to introduce evidence which controverts any fact the plaintiff must prove in order to recover." A federal district court in Michigan has stated that "what matters is not whether the magic words 'affirmative defense' appear in the pleadings, but whether the Court and the parties were aware of the issues involved." *Baker v. City of Detroit*, 483 F.Supp. 919, 921 (D.Mich. 1979); *see also Gilbert v. Eli Lilly & Co.*, 56 F.R.D. 116, 124 (D.P.R.1972). Although plaintiff complained at trial that Dawson's defense on pro se representation was not affirmatively pleaded, plaintiff did not claim that it was prejudiced by surprise or request a continuance. Therefore, the trial court was correct in ruling that since plaintiff had claimed attorney fees, "a general denial was sufficient to put plaintiff on their proof as to why the attorney's fees were owed, and whether they were justified in their claims."

## D. Pro Se Representation

The retainer agreement which Shaw and Dawson signed states that "the undersigned ... agrees to pay all collection costs, including attorney's fees incurred in the enforcement of this agreement." The trial court ruled that plaintiff was not entitled to fees for its pro se representation. Plaintiff cross-appeals that ruling.

In *Smith v. Batchelor*, 832 P.2d 467, 473 (Utah 1992), we recognized the "general rule that pro se litigants should not recover attorney fees for successful litigation." Although, as we acknowledged in *Batchelor*, the jurisdictions are divided in their treatment of the issue, we here reaffirm our view that the ability to competently present the claim without retained counsel is a sufficient advantage for a lawyer-litigant. We remain "loath to enhance that advantage by giving the lawyer-litigant recovery not only as a successful party, but also as that party's attorney." *Id.* at 474.

■ There are other compelling public policy reasons for holding that "pro se litigants should not recover attorney fees, regardless of their professional status." *Id.* "Financing litigation by fee awards provides a new incentive to lawyers to increase their fees. The adversary's predictable response is to litigate the fee claim itself." Dan B. Dobbs, *Awarding Attorney Fees Against Adversaries: Introducing the Problem,* 1986 Duke L.J. 435, 438 [hereinafter Dobbs]. This gives rise to the danger of "creating a 'cottage industry' for claimants . . . as a way to generate fees rather than to vindicate personal claims." *Falcone v. Internal Revenue Serv.,* 714 F.2d 646, 648 (6th Cir.1983) (declining to award attorney fees for pro se representation to prevailing plaintiffs under Freedom of Information Act). As the court in *White v. Arlen Realty & Development Corp.,* 614 F.2d 387, 388 (4th Cir.1980), observed: "It is axiomatic that effective legal representation is dependent not only on legal expertise, but also on detached and objective perspective. The lawyer who represents himself necessarily falls short of the latter."

In addition, "[i]n the case of a paying client, the lawyer who wants to retain client satisfaction will have an incentive to limit the total fee. That incentive is not present in fee award cases." Dobbs, *supra,* at 485. Although the case at hand provides a working illustration of all of the above problems, this last concern is probably the most serious. By way of example, Shaw sought to charge Dawson $900 for his time preparing for and appearing at trial as a witness. A captive client, such as Dawson became in this collection action, has no control over the amount of time the attorney will spend or how it will be spent. And plaintiff has no motivation to explore less expensive collection alternatives.

■ Plaintiff points out that *Batchelor* treated an award of attorney fees under a statute rather than a written retainer agreement as in the instant case. We conclude that plaintiff is not aided by that difference. The retainer agreement states that the client is responsible for "attorneys' fees incurred in the enforcement of this agreement." It is by no means self-evident that the time a lawyer spends on his own case represents fees "incurred." In *Swanson & Setzke, Chtd. v. Henning,* 116 Idaho 199, 774 P.2d 909, 910 (Ct.App.1989), the Idaho court interpreted "attorney fee" as denoting "a monetary obligation (a fee) paid or owed from one person (a client) to another person who has provided legal representation (an attorney)." We agree that under such an interpretation, "an attorney's fee 'presupposes a relationship of attorney and client' which does not exist in pro se situations." *Id.* (citing *Davis v. Parratt,* 608 F.2d 717, 718 (8th Cir.1979)). It is our view that a law firm does not "incur" fees when it uses its own attorneys in a collection action. Therefore, we hold that the trial court was correct in ruling that plaintiff was not entitled to attorney fees in its pro se collection action against Dawson.

### CONCLUSION

We direct that the judgment of the trial court be amended to award plaintiff a total of $18,000 less amounts paid by Dawson, together with interest on the unpaid balance thereof for plaintiff's representation of Dawson in the trial court in the divorce action. Fees which have been awarded for plaintiff's work on appeal of the divorce case are not disturbed by this ruling since no specific challenge to these fees appears in the briefs. The trial court's denial of fees to plaintiff for its pro se representation in this action is affirmed.

■ As a postscript to our decision, we observe that the events that brought this case to this court are disturbing. Dawson was awarded rehabilitative alimony of $1,400 per month for a two-year period, but because plaintiff was successful in tying up those funds, she was denied the timely benefit of that award. Plaintiff withdrew from representing Dawson while the appeal of the divorce case was pending and retained Dawson's file, claiming an attorney's lien on it. She was obliged to engage new counsel who successfully defended the appeal without the

file. The Utah Rules of Professional Conduct allow an attorney to withdraw from representation for nonpayment of fees if the client has been given adequate warning. Utah R. Professional Conduct 1.14(b)(4) (1995). The rules require, however, that upon termination of representation, "a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as surrendering papers and property to which the client is entitled." Utah R. Professional Conduct 1.14(d) (1995). Plaintiff failed to protect Dawson's best interest when it refused to surrender her file in derogation of that rule.

We urge members of the Bar to be clear and fair in their fee negotiations with clients and to avoid the misunderstandings that brought this case about. Fees should not be driven by billable hour requirements imposed by lawyers on themselves and by their firms. Moreover, when disputes do arise, attorneys should settle them without resorting to tying up rehabilitative alimony and retaining files to coerce payment.

ZIMMERMAN, C.J., and DURHAM and RUSSON, JJ., concur in Justice HOWE's opinion.

Having disqualified himself, STEWART, Associate C.J., does not participate herein.