**2016 UT App 163**

# THE UTAH COURT OF APPEALS

TANGREN FAMILY TRUST AND SHARON FISCUS,
Appellees,
*v.*
RODNEY TANGREN,
Appellant.

Opinion
No. 20140938-CA
Filed July 29, 2016

Seventh District Court, Monticello Department
The Honorable Lyle R. Anderson
No. 130700012

Joane Pappas White, Attorney for Appellant

Craig C. Halls, Attorney for Appellees

SENIOR JUDGE PAMELA T. GREENWOOD authored this Opinion, in which JUDGES STEPHEN L. ROTH AND KATE A. TOOMEY concurred.[1] JUDGE STEPHEN L. ROTH authored a concurring opinion, in which JUDGE KATE A. TOOMEY concurred.

GREENWOOD, Senior Judge:

¶1    Rodney Tangren appeals the district court's entry of a default judgment against him—claiming the court lacked jurisdiction to enter the judgment and that he was entitled to receive notice of the default—and its subsequent denial of his motion to set aside that judgment. We affirm.

---

1. Senior Judge Pamela T. Greenwood sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND

¶2    In 1994, Tangren—as lessee—entered into a ninety-nine-year lease (the Lease) with the Tangren Family Trust. The Lease was for property in San Juan County, Utah (the Property).[2] The Lease required that each month Tangren would pay $150 rent, one-twelfth of the estimated annual taxes, and one-twelfth of the annual cost of all necessary insurance. The Lease further indicated that Utah law governed the performance of the agreement and that "[i]n the event it becomes necessary for any party to employ an attorney to enforce the terms of [the Lease] or protect his rights, the prevailing party shall be entitled to reasonable attorney fees and court costs incurred thereby."

¶3    Tangren's father was the Trust's settlor and original trustee. When a Nevada court determined that Tangren's father was incompetent, Tangren's sister, Sharon Fiscus, became his guardian and the successor trustee of the Trust.

¶4    In 2011, Fiscus requested that the Nevada court remove the Trust from its jurisdiction. Tangren objected and petitioned to remove Fiscus as trustee. Around the same time, an eviction case was pending in Utah, which sought to remove Tangren from the Property for failure to provide proof of insurance on the Property. The parties eventually agreed that Tangren would obtain and provide proof of a $1 million insurance policy on the Property. In return, the Trust would dismiss the Utah eviction case.

¶5    The Nevada case was resolved when the Nevada court found that all matters pertaining to the Lease "involve[d] the external affairs of the . . . Trust" and, "[w]hile [the Nevada court]

---

2. This is not the first time these parties and the Lease have been before this court. *See generally Tangren Family Trust ex rel. Tangren v. Tangren*, 2006 UT App 515, 154 P.3d 180, *aff'd but criticized sub nom. Tangren Family Trust v. Tangren*, 2008 UT 20, 182 P.3d 326.

ha[d] exclusive jurisdiction over the internal affairs of the . . . Trust, it [did] not have exclusive jurisdiction over the external affairs of the . . . Trust." The Nevada court further concluded that the issues raised by Tangren's petition "involve[d] his interests as a Lessee of real property and [did] not involve his interest as beneficiary or other interested party of the internal affairs of the . . . Trust." Later, the Nevada court removed the Trust from Nevada's continuing jurisdiction to allow issues related to the Property "to be properly raised and decided by the Seventh District Court—Montecello [sic] of San Juan County, State of Utah, the situs of the real property subject to the Lease."

¶6    The Trust thereafter filed a complaint against Tangren in Utah, stating several causes of action and seeking an injunction. It sought injunctive relief because Tangren had hosted activities on the Property for which he did not have insurance, including an aircraft fly-in. The fly-in "involved several aircraft flying into the [Property] for a weekend of airplane games, shooting, and socializing." As the Trust explained, "The activity (aircraft takeoff and landing) exposes [the Trust] to liability if someone [were] to become hurt or an accident were to occur. . . . There is no liability insurance in place presently which insures the contemplated activity . . . ." The Trust further alleged that another fly-in was scheduled for the following month, and it sought a temporary restraining order to enjoin the fly-in or require Tangren to obtain adequate insurance for the activity. Separately, the complaint brought two claims for breach of the Lease; the Trust alleged that Tangren was presently in arrears for his payment of the insurance premiums and that Tangren still owed for past increases to the amount of insurance. For these claims, the Trust sought a writ of restitution removing Tangren from the Property and allowing the Trust to take possession of it. Tangren was served with the summons and complaint on April 30, 2013.

¶7    The district court held a temporary restraining order hearing on May 6, 2013, which Tangren, Fiscus, and counsel for

the Trust attended. At the hearing, the Trust explained the requirement under the Lease that Tangren pay for insurance on the Property as well as its concerns regarding the scheduled fly-in and the risk of exposing the Trust to liability. Tangren responded that in recent years, the Trust had insisted on unnecessarily increasing the insurance on the Property. The court discussed the Nevada case at length with the parties, including what the Nevada court had decided and distinguishing between the $1 million policy the Nevada court had ordered "on the lodge" and the present concerns that that policy "doesn't cover the runway or any other activity." The court then told Tangren, "If you think [the Property is] worth 2 million, then that's what's at risk here. . . . That's the reason for the insurance requirement." It went on to order, "Then you have $2 million of coverage and that's for all liability or you will not have this [fly-in]." Tangren replied, "Okay, your Honor," and the hearing concluded. The district court issued a written temporary restraining order on May 8, 2013. The order indicated that a copy of the order was mailed to Tangren at the Property. Tangren denies that he received the order.

¶8     Tangren never filed an answer to the complaint, and the district court ultimately entered a default judgment against Tangren for a "Writ of Restitution restoring [the Trust] to the possession of the [Property]." Then, at a hearing in November 2013, the district court heard testimony from Tangren and Fiscus regarding damages before ordering Tangren to pay the Trust for unpaid insurance premiums, court costs, and attorney fees.

¶9     Arguing that service of the complaint and summons had been defective, Tangren moved to set aside the default judgment. The district court denied the motion, finding that Tangren's testimony on the issue of service was not credible, that "Tangren exerted virtually no effort to understand what was required of him," and that he "made a deliberate decision not to seek advice of counsel because he was sure of the rightness of his position." The district court further concluded that although the

summons Tangren had received was defective, the defect was harmless. Specifically, while the summons had erroneously indicated that Tangren had only ten days to answer the complaint, he was actually given more than two months to answer before the default judgment was entered. This was "the only grounds for setting aside the default in this case that the Court considered seriously." This appeal followed.

## ISSUES AND STANDARDS OF REVIEW

¶10   Tangren raises two issues for our review. First, he asserts that the district court lacked subject matter jurisdiction to decide this case. "Whether a [district] court has subject matter jurisdiction presents a question of law which we review under a correction of error standard, giving no particular deference to the [district] court's determination." *Reller v. Reller*, 2012 UT App 323, ¶ 7, 291 P.3d 813 (citation and internal quotation marks omitted).

¶11   Second, Tangren argues that the district court erred when it denied his rule 60(b) motion to set aside the default judgment and writ of restitution. "[A] district court has broad discretion in ruling on a motion to set aside an order or judgment under rule 60(b), and '[t]hus, we review a district court's denial of a 60(b) motion under an abuse of discretion standard.'" *Metropolitan Water Dist. of Salt Lake & Sandy v. Sorf*, 2013 UT 27, ¶ 12, 304 P.3d 824 (second alteration in original) (quoting *Menzies v. Galetka*, 2006 UT 81, ¶ 54, 150 P.3d 480).

## ANALYSIS

### I. Subject Matter Jurisdiction, Full Faith and Credit, and Collateral Estoppel Claims

¶12   Tangren challenges the district court's election to hear this case. Specifically, he argues that the Nevada court—not the Utah

district court—has subject matter jurisdiction, that "the Nevada order was entitled to full faith and credit," and that the issue of insurance on the Property, being fully litigated in Nevada, should not have been reconsidered. We conclude that the district court did, indeed, have subject matter jurisdiction and that the court's decisions did not run afoul of the Full Faith and Credit Clause of the United States Constitution, *see* U.S. Const. art. IV, § 1, or the doctrine of collateral estoppel.

¶13 "Subject matter jurisdiction is the authority and competency of the court to decide the case," *Franklin Covey Client Sales, Inc. v. Melvin*, 2000 UT App 110, ¶ 24 n.3, 2 P.3d 451, and is "a prerequisite to [the] court's power to consider substantive issues," *Ameritemps, Inc. v. Labor Comm'n*, 2005 UT App 491, ¶ 10, 128 P.3d 31. As Tangren points out, "'[c]hallenges to subject matter jurisdiction may be raised at any time, even for the first time on appeal.'" (Quoting *Sonntag v. Ward*, 2011 UT App 122, ¶ 2, 253 P.3d 1120.)

¶14 The district court presumably had subject matter jurisdiction in this case, considering "[t]he district court has original jurisdiction in all matters civil and criminal, not excepted in the Utah Constitution and not prohibited by law." *See* Utah Code Ann. § 78A-5-102(1) (LexisNexis 2012). This is a civil matter, and Tangren points us to no constitutional provision or other law that deprived the district court of jurisdiction.[3] Instead, Tangren confuses the principles of subject

---

3. In his reply brief, Tangren concedes that the district court "has subject matter jurisdiction over the Lease" but alters his argument to attack the district court's order requiring him to obtain a $2 million insurance policy. He contends that because "the Lease does not contain terms that Tangren would be the party obtaining the insurance policies or that he was required to provide proof of the policies to the Trust," the district court's order "was not within its subject matter jurisdiction pursuant to

(continued…)

matter jurisdiction and full faith and credit, arguing that because the Nevada court heard a related case, the district court was somehow deprived of jurisdiction.[4] He specifically argues that the district court's actions violated the principle of full faith and credit. "This is significant because, unlike claims of subject matter jurisdiction, full faith and credit claims are subject to waiver if not raised in a timely fashion." *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 38, 266 P.3d 702. Tangren failed to raise his full faith and credit argument in the district court, and it is therefore unpreserved for appeal. Accordingly, we decline to address it.[5] *See, e.g.*, *VCS, Inc. v. Countrywide Home Loans, Inc.*,

---

(…continued)
the Complaint." Even if we determined that this argument was tenable, "we will not consider matters raised for the first time in the reply brief." *See Coleman ex rel. Schefski v. Stevens*, 2000 UT 98, ¶ 9, 17 P.3d 1122.

4. In his own words, "Tangren challenges the trial court's subject matter jurisdiction in that . . . the Nevada Order was entitled to full faith and credit as a foreign order." It seems to us axiomatic that to satisfy the Full Faith and Credit Clause, an honoring court would need to have proper jurisdiction and, thus, the mere existence of a foreign order could not deprive the honoring court of jurisdiction.

5. We do briefly note that Tangren's argument appears to suffer from another determinative flaw. While "a state must give full faith and credit to the judgments of other states[,] . . . to be given full faith and credit[] these foreign judgments must be both valid and final." *Lilly v. Lilly*, 2011 UT App 53, ¶ 25, 250 P.3d 994. The Nevada order that Tangren argues should have been given full faith and credit begins: "It is hereby ordered that this matter is hereby continued . . . ." It then goes on to make interim orders based on the parties' agreement, including requiring Tangren to secure and provide proof of a $1 million insurance policy on the Property and requiring the Trust to dismiss the then-pending

(continued…)

2015 UT 46, ¶ 21, 349 P.3d 704 ("We decline to address the merits of this argument, however, because it is unpreserved.").

¶15 Tangren also argues that the district court was barred from considering the issue of insurance on the Property because it had been "fully litigated in Nevada." Specifically, he claims that the doctrine of collateral estoppel, or issue preclusion, prohibited the district court's order regarding insurance on the Property.[6]

---

(…continued)
Utah litigation. Section 78B-5-302 of the Utah Code outlines how a litigant may file a foreign judgment in this state, thus providing the judgment full faith and credit. Specifically, the foreign judgment "may be filed with the clerk of any district court in Utah." Utah Code Ann. § 78B-5-302 (LexisNexis 2012). Further highlighting Tangren's lack of preservation of this point, Tangren never attempted to register the Nevada order with the district court, and thus the district court never had occasion to give the order full faith or credit. This is to say nothing of the fact that the Nevada court eventually entered another order—the final order in the Nevada case—in which it removed the Trust from the Nevada court's continuing jurisdiction and concluded that it did not have jurisdiction to hear matters related to the Lease, indicating that such issues should be raised and decided by the Utah district court. *See supra* ¶ 5.

6. Tangren asserts that the purported applicability of collateral estoppel somehow deprived the district court of subject matter jurisdiction. However, we decide this issue using the elements of a collateral estoppel claim, ignoring that Tangren's description of this challenge as one of subject matter jurisdiction is imprecise. *Cf. Monavie, LLC v. Quixtar Inc.*, 741 F. Supp. 2d 1227, 1234 n.8 (D. Utah 2009) (explaining that assertions of the applicability of "collateral estoppel do not raise questions of subject matter jurisdiction").

¶16   We use a four-part test to determine whether the doctrine of collateral estoppel applies in a certain instance:

> First, the issue challenged must be identical in the previous action and in the case at hand. Second, the issue must have been decided in a final judgment on the merits in the previous action. Third, the issue must have been competently, fully, and fairly litigated in the previous action. Fourth, the party against whom collateral estoppel is invoked in the current action must have been either a party or privy to a party in the previous action.

*Jones, Waldo, Holbrook & McDonough v. Dawson*, 923 P.2d 1366, 1370 (Utah 1996). For purposes of this decision, we focus solely on the second part of this test.

¶17   We are not convinced that the Nevada order, which required Tangren to obtain a $1 million insurance policy on the Property, can be considered a final judgment on the merits. The Nevada court prefaced its order by indicating that the matter was continued to a later date and then entered its orders regarding the parties' required conduct before that date. *See Gallipo v. City of Rutland*, 789 A.2d 942, 952 (Vt. 2001) (explaining that, in a worker's compensation case, issue preclusion did not apply because "the interim order does not qualify as a final judgment"); *cf. Silvan W. v. Briggs*, 309 F. App'x 216, 222 (10th Cir. 2009) (noting without deciding that "issue preclusion is potentially applicable" where a lower court "simply made an interim determination pending additional proceedings" but indicating that in the case at bar "the outcome of those proceedings" was unclear on the record (citation and internal quotation marks omitted)).

¶18   Tangren's only argument on this point is that the Nevada order's finality is "shown by the plain language of the Nevada Order." But as already discussed, the plain language indicates

that the Nevada court "ordered that this matter [was] hereby continued." Then, in a subsequent order—the last order entered in the Nevada case so far as we can tell—the Nevada court ordered that the Trust be removed from its continuing jurisdiction and found that the Nevada court "does not have jurisdiction to hear" "matters raised before [the Nevada court] with regard to the Lease . . . and disputes thereunder."

¶19    Because the Nevada court addressed the insurance issue in what can only be described as an interim order and later concluded that it did not have jurisdiction to consider the issue, as it was raised under the Lease, the insurance issue was not decided in a final judgment on the merits.[7] *See Jones, Waldo, Holbrook & McDonough*, 923 P.2d at 1370. The doctrine of issue preclusion is therefore inapplicable. *See id.*

## II. The District Court's Denial of Tangren's Rule 60(b) Motion

¶20    The second issue on appeal is whether the district court abused its discretion when it denied Tangren's motion to set aside the default judgment under rule 60(b) of the Utah Rules of Civil Procedure. Tangren suggests that the motion should have been granted for several reasons, including that he was served

---

7. Moreover, while both the Nevada case and the Utah case addressed the question of what and how much insurance was required on the Property, the issues were not identical. *Cf. Jones, Waldo, Holbrook & McDonough v. Dawson*, 923 P.2d 1366, 1370 (Utah 1996) (requiring that, for collateral estoppel to apply, before all else "the issue challenged must be identical in the previous action and in the case at hand"). The Nevada order required that Tangren obtain a standard insurance policy for the Property. But the district court addressed the need for additional insurance because Tangren had scheduled fly-in activities, and the present insurance on the Property "does not protect all liability for [flying or skydiving] activities."

with a defective summons and that the default judgment was improperly entered.[8] In Tangren's view, these points demonstrate that "excusable neglect existed throughout the case . . . . When viewed as one large whole, the cumulative excusable neglect and prejudice developed throughout the case."

¶21  "A trial court has discretion in determining whether a movant has shown 'mistake, inadvertence, surprise, or excusable neglect,' and this Court will reverse the trial court's ruling only when there has been an abuse of discretion." *Larsen v. Collina*, 684 P.2d 52, 54 (Utah 1984) (quoting Utah R. Civ. P. 60(b)(1)). Our supreme court has explained

> that excusable neglect requires some evidence of diligence in order to justify relief. In other words, while the district court's discretion to grant relief under rule 60(b) for excusable neglect is broad, it is not unlimited. A district court must exercise its broad discretion in furtherance of the ultimate goal of the excusable neglect inquiry: determining whether the moving party has been sufficiently diligent that the consequences of its neglect may be equitably excused.

*Jones v. Layton/Okland*, 2009 UT 39, ¶ 20, 214 P.3d 859. Tangren has not demonstrated excusable neglect; thus the district court did not abuse its discretion in denying his motion to set aside the default judgment.

---

8. Tangren also argues that the preliminary injunction was entered improperly, but we fail to see how the preliminary injunction has any bearing on the default judgment entered in this case or the district court's denial of Tangren's rule 60(b) motion. We therefore decline to consider that question.

A.      Defective Summons

¶22    The district court found that the summons served on Tangren was defective, in that it indicated he had only ten days in which to answer the complaint. But the court also found that Tangren was not prejudiced by this defect, because he ultimately had eighty days to respond before the district court entered default judgment. Tangren contends that he was prejudiced because the defective summons "created an unclear proceeding in this matter." This argument fails to explain why Tangren neglected to answer the complaint at any point in time, including after the entry of the preliminary injunction, at which point Tangren undoubtedly had a clear picture that the instant case was distinct from the Nevada case. And we agree with the Trust that Tangren's confusion argument is made "without any citation to authority or analysis as to how this should afford him relief under grounds for 'excusable neglect' under Rule 60(b)." The defective summons was not prejudicial, and the district court did not abuse its discretion in denying Tangren's motion on that ground.

B.      Propriety of Default

¶23    Tangren also argues that a default judgment should never have been entered because although he failed to answer, he "otherwise defended" in this case. Specifically, he contends that because he "appeared" at the preliminary injunction hearing, he "otherwise defended," in accordance with rule 55 of the Utah Rules of Civil Procedure. He also complains that because he physically appeared at the hearing, he "appeared" in this action, thus entitling him to be served with additional pleadings under rule 5 of the Utah Rules of Civil Procedure. We are not persuaded.

¶24    The issues addressed at the preliminary injunction hearing were distinct from other claims alleged in the complaint. The hearing was focused on discerning what had occurred and been ordered by the Nevada court, as well as the fly-in activities

and the associated need for liability insurance. There was no discussion of the Trust's breach of the Lease claims or its request for a writ of restitution removing Tangren from the Property. There was no discussion about Tangren's alleged violations of the Lease by failing to pay the insurance premiums that were in place at that time or in the past. Similarly, there was no attempt by Tangren to defend against the alleged breach of the Lease. The hearing focused on injunctive relief and, as such, Tangren did not "otherwise defend" against the complaint at the hearing. *See* Utah R. Civ. P. 55(a).

¶25    Similarly, his presence at the hearing did not qualify as an "appearance" in the instant case. *See id.* R. 5(a)(2); *Arbogast Family Trust v. River Crossings, LLC*, 2010 UT 40, ¶ 24, 238 P.3d 1035 (acknowledging "a trend in our own case law toward requiring formal filing" for a party to "appear" under rule 5). In *Arbogast*, our supreme court engaged in an in-depth look at rule 5 and what it means for a party to "appear." 2010 UT 40, ¶ 16 ("This case presents us with the task of interpreting a single word within one of our procedural rules."). The court acknowledged that the question of what constitutes an appearance "has led to a surprising amount of litigation in other parts of the country" but that Utah has "limited case law discussion of rule 5 requirements." *Id.* ¶ 24. It nevertheless found "the formal filing approach to be most consistent with the purpose of our rules of civil procedure. Requiring a party to make a formal filing or submission to the court creates a bright-line rule that is sensible and easy to administer." *Id.* ¶ 32 (citations and internal quotation marks omitted).

¶26    In *Arbogast*, that bright-line rule meant that a party who had "failed to make a formal appearance through a pleading in the action" was not entitled to receive notice that an opposing party was seeking a default judgment. *Id.* ¶¶ 8, 15. This was so even though the party in default had sought and received an extension of time to answer the complaint, had made a settlement offer, and had sent the opposing party an email

proposing to discuss the case. *Id.* ¶¶ 5–6. But our supreme court clarified, "Once a party formally *files or submits a pleading* to the court, it is entitled to notice of all activity throughout the proceedings, and no default judgment may be entered without first serving the defaulting party." *Id.* ¶ 30 (emphasis added); *compare Lund v. Brown*, 2000 UT 75, ¶¶ 3–4, 27, 11 P.3d 277 (concluding that where a party had filed a complaint but had failed to answer a counterclaim, the party had "made an appearance" and was therefore entitled to notice of default), *with Central Bank & Trust Co. v. Jensen*, 656 P.2d 1009, 1010–11 (Utah 1982) (concluding that where a party had failed to answer a complaint but had contacted opposing counsel and discussed the complaint and proceedings, the party was not entitled to notice of default).

¶27 As the "bright-line rule" from *Arbogast* is that a party must file or submit a pleading to the court in order to appear, *see Arbogast*, 2010 UT 40, ¶¶ 30, 32, we conclude that here—where Tangren attended a hearing focused solely on a preliminary injunction, never filed any pleading with the court, and never answered the complaint's allegations of breach of the Lease—Tangren did not appear for purposes of rule 5, *see* Utah R. Civ. P. 5(a)(2)(B).[9]

¶28 Simply put, Tangren's presence at the preliminary injunction hearing did not relieve him of his obligation to answer the complaint in this case, and it did not guarantee that he would be provided further notice of the proceedings against

---

9. We believe that *Arbogast Family Trust v. River Crossings, LLC*, 2010 UT 40, 238 P.3d 1035, in defining a bright-line rule, is controlling authority and mandates the result in this case. If there are to be any modifications encompassing the facts of this or similar cases, in which a single personal physical appearance in court took place, it is the exclusive prerogative of the Utah Supreme Court to make them.

him. Because we disagree with Tangren's position on these issues, we cannot agree that the district court abused its discretion in failing to grant his rule 60(b) motion.

## CONCLUSION

¶29 The district court had jurisdiction to hear this case, and Tangren failed to answer the complaint against him. The district court therefore did not err in granting default judgment against Tangren or in denying his motion to set aside that judgment.

¶30 Affirmed.

_____

ROTH, Judge (concurring):

¶31 I concur in the reasoning and the result of the lead opinion because, as aptly expressed in note 9, the result appears to be mandated by the Utah Supreme Court's decision in *Arbogast Family Trust v. River Crossings, LLC*, 2010 UT 40, 238 P.3d 1035. However, I write separately to express my concern that under current Utah law, as expressed in *Arbogast*, a party's personal appearance in court to defend against a substantive motion, as Tangren did here, does not amount to an "appearance" under rule 5.

¶32 I agree with the lead opinion's conclusion that "the 'bright-line' rule from *Arbogast* is that a party must file or submit a *pleading* to the court in order to appear" for purposes of rule 5(a). *See supra* ¶¶ 26–27. Indeed, in adopting the requirement for "a formal filing" as the sine qua non of an appearance, *Arbogast* sought to identify a "bright-line rule that is sensible and easy to administer," and that would avoid the "lack of clarity, practical difficulty, and inconsistent results as to what conduct and level of participation is needed to appear" under the majority "informal contacts" rule. *See Arbogast*, 2010 UT 40, ¶¶ 25, 29, 33 (citations and internal quotation marks omitted).

¶33    But *Arbogast* involved a defaulted defendant's claim that an informal extension of time arranged between counsel to answer the complaint and a pending settlement offer were enough of an indication of the defendant's intention to defend the case to constitute an "appearance" under rule 5. *See id.* ¶¶ 5–7. The court's concern was to set a standard for appearance that, in contrast to the "informal contacts" rule, would "eliminate case-by-case litigation over whether a party's informal actions rise to the level of an appearance and best promote[] efficient court management by allowing court clerks to quickly and easily determine whether the defaulting party has appeared in an action." *Id.* ¶ 33. It is in this context that the court summarized its decision: "We hold that in every instance, communications and conduct *between parties* will only enjoy the status of an appearance under rule 5 if marked by a formal filing with the tribunal in which the relevant action is pending." *Id.* ¶ 34 (emphasis added).

¶34    In contrast, in the case before us, Tangren does not rely on informal communication with opposing counsel to support his claim that he was entitled to notice before entry of default; he relies on his actual appearance in court to contest the Trust's preliminary injunction motion. (And it may be worth noting that it is almost impossible to describe Tangren's presence at the preliminary injunction without using some form of the common term "appearance.") Indeed, *Arbogast*'s discussion of the plain meaning of the term "appearance" suggests that what Tangren did ought to meet rule 5's requirement:

> Legal definitions of "appearance" include "[t]o present oneself *formally* before a court as defendant, plaintiff or counsel," American Heritage Dictionary 120 (emphasis added), or to "*com*[*e*] *into court* as a party or interested person" or by "participating in [a lawsuit] by *answer*, demurrer, or motion." Black's Law Dictionary 107 (8th ed. 2004) (emphasis added). Historically, an

> appearance required "some act by which a person
> who is sued submits himself to the authority and
> jurisdiction of the court." Black's Law Dictionary
> 107.

*Id.* ¶ 19 (alterations in original) (final citation curtailed). Certainly, by defending against the plaintiff's motion at a court hearing scheduled for that purpose, Tangren can be said to have presented himself "formally before a court as defendant," "com[e] into court as a party," or "submit[ted] himself to the authority and jurisdiction of the court" just as thoroughly as he would have by submitting a formal pleading. *See id.* (citations, emphasis, and internal quotation marks omitted). And in doing so, he effectively communicated to the court—and to the plaintiff—his intention to participate in the proceedings. *See Plaza del Lago Townhomes Ass'n v. Highwood Builders, LLC*, 148 P.3d 367, 371 (Colo. App. 2006) (concluding "communication with the court is required" and that the "phrase 'appeared in the action' . . . requires that a defendant communicate with the court in a manner that demonstrates to the court that the defendant is aware of the proceedings and intends to participate in them" (citation omitted)); *see also Arbogast*, 2010 UT 40, ¶ 30 (citing *Plaza del Lago Townhomes Ass'n*, 148 P.3d at 371, for the same).

¶35   In my view, the *Arbogast* reasoning can be extended to include within the scope of an "appearance" under rule 5(a)(2)(B) a party's active participation in a substantive proceeding in a case so as to thereafter require service of the papers described in rule 5(a)(1), including the filings prompting and related to the entry of default and default judgment. *See* Utah R. Civ. P. 5(a)(1), (2)(B). A party's appearance at such a proceeding "suggest[s] an obvious and definite presence before a court" and "leaves no question as to the presence of a party or his intent to defend the suit." *Arbogast*, 2010 UT 40, ¶ 19. It also meets the primary requirements of "a bright-line rule that is sensible and easy to administer." *Id.* ¶ 33 (citation and internal quotation marks omitted). Indeed, like a "formal filing," a

party's physical appearance and formal participation in a hearing "will leave no question in the minds of plaintiffs, defendants, or courts as to who has made an appearance in a case" and should not result in "case-by-case litigation over whether a party's informal actions rise to the level of an appearance." *Id.* And court clerks can just as "quickly and easily determine whether the defaulting party has appeared in an action" by the party's actual participation in a court proceeding as through a formal filing. *Id.*

¶36 In sum, if an appearance under rule 5 included the sort of appearance that Tangren made at the preliminary injunction proceeding—as I think it should—default judgment could not have been entered against him until he was served with a motion for entry of default and related papers. *Cf. id.* ¶ 30 ("Once a party formally files or submits a pleading to the court, it is entitled to notice of all activity throughout the proceedings, and no default judgment may be entered without first serving the defaulting party."). Nevertheless, I agree with the lead opinion that our supreme court's holding that the "bright-line rule" requires "a formal filing" limits our ability to consider a different result here. *See id.* ¶¶ 33–34.

———